No. 27,776.

THE STATE OF KANSAS, *Appellee*, v. CHARLES BUSEMAN, *Appellant*.

(260 Pac. 641.)

SYLLABUS BY THE COURT.

1. BURGLARY — *Stealing Chickens in Nighttime — Evidence*. The evidence given in support of a charge of stealing chickens in the nighttime, including that relating to the habits of chickens, is deemed to be sufficient to uphold the conviction.

2. CRIMINAL LAW—*Impeaching Verdict—Affidavit of Juror*. Jurors are not permitted to impeach their verdict to which they have deliberately agreed, under sanction of an oath, upon a ground which essentially inheres in the verdict itself.

3. SAME—*Impeaching Verdict—Affidavit of Juror—Hearsay Report*. An affidavit presented on a motion for a new trial to the effect that a statement had been made by one juror to another during a recess of the trial, that a third person had told him that she had heard a report that the defendant had previously committed another offense, the report not being stated as a positive fact within the knowledge of the informant and was one which could not be received as evidence of the fact asserted, did not require the setting aside of the verdict.

Appeal from Clay district court; FRED R. SMITH, judge. Opinion filed November 5, 1927. Affirmed.

*W. T. Roche*, of Clay Center, for the appellant.

*William A. Smith*, attorney-general, and *C. Vincent Jones*, county attorney, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: Charles Buseman was convicted upon a charge of stealing chickens in the nighttime and founded his appeal upon two grounds, first, the insufficiency of the evidence to sustain the conviction, and second, misconduct of a member of the jury.

Concerning the first ground there is testimony that W. J. Finley owned and kept a flock of well-bred Buff Orpington chickens; that on the evening of the last day of December, 1926, and after his

Criminal Law, 17 C. J. pp. 223 n. 44, 354 n. 84. Larceny, 36 C. J. pp. 882 n. 36 new, 899 n. 34. New Trial, 29 Cyc. pp. 801 n. 97, 982 n. 3. Verdicts, 27 R. C. L. 897.

chickens had gone to roost, he closed the door of the chicken house, and on the following morning he found that thirty-five of them were missing. Later he learned that a dealer in Clay Center had purchased that number of Buff Orpington chickens, and when he visited the dealer, who had kept them apart from others, he insisted that they belonged to him, and he then learned that the chickens had been purchased from defendant on the night of the day they were taken from his chicken house. A warrant for the arrest of defendant was promptly issued, and when he was taken into custody he claimed he had purchased them from one Craig, but on the trial he testified that he bought them from his brother, who lived in an adjoining county. It appears that he had purchased a mixed bunch of chickens from Craig, but had sold them to another dealer before the Finley chickens were taken. The controversy on this branch of the case relates to the identification of the chickens and the ownership by Finley.

Defendant claims that they were not shown to be the chickens of Finley, that the testimony was wholly circumstantial, and that the identity was based wholly on the habits of chickens. It was further shown that when the chickens were taken back to Finley's farm, a marker was attached to each of them and all were then released a considerable distance from the chicken house. The testimony is that when turned loose they went to the end of a pipe leading from the milk house and drank milky water found there. When roosting time came, they went to roost with other chickens as if they were familiar with the place. Mixing with the other chickens on the farm there was no fighting between those brought in and those left on the farm, and it was in testimony that when strange chickens are brought to a chicken yard containing others there is fighting, and further that strange chickens do not go into a chicken house with which they are not familiar, but go to roost in trees. and other places outside. The chickens in question did not hold back or act as strangers, but went to roost as if they were at home.

A further test was afterwards made by taking two of the marked chickens after they had gone to roost, carrying them some distance from the chicken house, and when they were turned loose they ran back at once to the chicken house. Both parties produced testimony on this phase of the case relating to the habits of chickens.

This testimony, although not strong, was competent and could be

32—124 KAN.

taken by the jury for what it was worth. The instructions are not preserved in the record, and hence we must assume that the court properly instructed the jury as to the force and consideration to be given that kind of testimony. It cannot be said that there was no testimony of identification except that relating to the habits of chickens and their action when they were returned to the Finley farm. One of the chickens was positively identified by two witnesses by a broken spur. While Finley and his wife said they were familiar with the appearance of their chickens and claimed that they belonged on the farm, they were compelled to state that there was no distinguishing mark on them other that the one mentioned, and also conceded that it was difficult to identify chickens of the same breed and color.

After the arrest of defendant, he called on Finley and proposed to settle the matter, stating that the trouble would kill his wife and mother, and if Finley would settle and buy his stuff he would go so far away that Finley would never hear of him again.

The testimony related, including the conflicting statements of defendant as to the person from whom he purchased the chickens in question, is deemed to be sufficient to sustain the conviction.

The remaining point, that error, was committed in denying defendant's motion for a new trial because of the misconduct of the members of the jury, is founded on the following testimony: An affidavit of a juror was filed to the effect that upon the adjournment of the court upon the evening of the first day of the trial, the jurors returned to their homes, and that Lou Holliday, one of the jurors, while at his home, was told by his wife that she had been informed by some one else that defendant had stolen wheat from one Goodin, and that on the following morning while he and Merrill Johnston, another juror, were traveling back together in an automobile to resume their duties as jurors, Holliday told Johnston of the statement made to him by his wife. The trial had proceeded to near the close of the evidence, and then that morning after the completion of the evidence, the instructions of the court and the argument of attorneys, the jury retired to deliberate on their verdict. In his affidavit Johnston said that the statement of his fellow juror Holliday "affected the verdict of this affiant and helped to cause him to change his vote from not guilty to guilty." Holliday's affidavit was to the effect that he had told Johnston what his wife had

told him, but did not state that the rumor had affected his verdict. After considering the affidavits and some other testimony not material here, the court overruled the motion for a new trial.

The state insists that the affidavit of Johnston was not competent in that it tended to impeach his verdict. It is a general rule founded on sound public policy that jurors are not permitted to impeach a verdict to which they have deliberately agreed under the sanction of an oath. There would be little virtue or finality in verdicts if they could be impeached and overthrown by the evidence of dissatisfied or unduly influenced jurors. It has been said that: "It would result in perjury and bribery and there would be no end of litigation in cases tried before juries." (27 R. C. L. 897.) We have held that verdicts cannot be destroyed by the affidavits of jurors stating a ground which essentially inheres in the verdict itself. (*State v. Horne,* 9 Kan. 119.) In that case the court approved a rule announced in *Wright v. Telegraph Co.,* 20 Ia. 195, that a juror will not be permitted to impeach his verdict by a statement that "he was unduly influenced by the statements (or otherwise) of his fellow jurors." (See, also, *State v. Bowman,* 80 Kan. 473, 103 Pac. 84; *State v. Keehn,* 85 Kan. 765, 118 Pac. 851.)

In *Ohlson v. Power Co.,* 105 Kan. 252, 182 Pac. 393, it was said:

"A juror may testify as to what transpires in a jury room (*Barber v. Emery,* 101 Kan. 314, 318, 319, 167 Pac. 1044), but he may not tell what considerations constrained him to his decision, nor give the reasons for his ·verdict. In short, he cannot be heard to confess his own recreancy in order to impeach his own verdict." (p. 254.)

Again, if the statement of Holliday could be treated as something not included in the verdict, it is not of the character which requires the setting aside of the verdict. The statement of Holliday was not a fact within his own knowledge. It was not even an expression of his own opinion. It was nothing that could have been received in evidence if it had been offered on the trial. It was a mere rumor, something the juror heard from one who had heard of it by another, who in turn had been told of it by still another unidentified person, none of whom had asserted the truth of the report. It has been decided that before extraneous statements can amount to ground for reversal—

"It must be shown that such prejudicial statements so made were of positive facts within the knowledge or asserted to be within the knowledge of

the juror making them and such as the jury might receive as evidence of the fact asserted and not as the mere expression of opinion of the juror." (*Hulett v. Hancock,* 66 Kan. 519, syl., 72 Pac. 224; *Madison v. Railway Co.,* 88 Kan. 784, 129 Pac. 1157.)

Defendant cites *State v. Lowe,* 67 Kan. 183, 72 Pac. 524, in support of his contention, but in that case as in others cited the statement deemed prejudicial was one made by a juror to his associates based upon his own personal knowledge. The remark made to the juror was a hearsay statement, was not made as a fact, nor was it made as being within the knowledge of the informant. It came through the mouths of several persons, no one of whom had spoken of it as authentic or worthy of belief. The cases cited where the extraneous statements were received were based upon personal knowledge of a juror to his associates, and stated as facts, and hence are not applicable to the present case. Some of these are reviewed in *State v. Farrar,* 103 Kan. 774, 176 Pac. 987. Moreover, a juror of average intelligence acting under his oath and presumably under an instruction of the court, that the verdict must be based alone on the evidence produced at the trial, could not have been led astray by the mentioned rumor.

The judgment is affirmed.