No. 41,215

AGATHA THOMAS, Administrator of the Estate of James R. Thomas, Deceased, *Appellee*, v. THE KANSAS POWER AND LIGHT COMPANY, a Corporation, *Appellant*.

(340 P. 2d 379)

Opinion filed June 18, 1959.

*Robert E. Russell*, of Topeka, and *James S. Lester*, of Oskaloosa, argued the cause, and *Clayton E. Kline; M. F. Cosgrove; Willard N. Van Slyck, Jr.; William B. McElhenny*, and *James L. Grimes, Jr.*, all of Topeka, were with them on the briefs for the appellant.

*Harold E. Doherty*, of Topeka, argued the cause, and *William C. Leech*, of Oskaloosa, was, with him on the briefs for the appellee.

The opinion of the court was delivered by

PARKER, C. J.: This was an action by the duly appointed statutory (G. S. 1949, 59-705 and 59-2232) representative of the estate of a deceased intestate to recover damages under the wrongful death statute. Plaintiff recovered and the defendant appeals.

The facts giving rise to the accident are not in dispute and can be stated thus:

On May 24, 1955, James R. Thomas, who with his wife and four minor children resided on a farm three and one-half miles north of Oskaloosa on Highway 59, purchased a television set from Lee M. Fraker of Winchester, who was engaged in the business of television sales and service.

On the same date Fraker went to the Thomas home for the purpose of installing the television set and erecting the television mast and antenna. He contacted Thomas and proceeded to assemble the television mast which, when assembled, was a twenty-five foot rod, one end being referred to as the base and the other end as the top. After assembling the mast Fraker accompanied by Thomas went around to the north side of the farm house. He placed the base end of the mast against the foundation of the house at the point where such mast was to be erected and then put the mast on the ground so that it was perpendicular with the foundation of the house and extended north of the building twenty-five feet.

At the time in question a 7,200 volt transmission high line of the defendant extended from a pole located on the east side of Highway 59 in front of plaintiff's farm yard and across such highway to the west and then across the farm yard for a span of two hundred sixty-six feet to a high line transformer pole located to the west and north of the back of the house. The high line ran twenty feet north of the house at the place where the television mast was lying upon the ground so that the mast was directly under defendant's transmission line, the top portion thereof extending five feet north of such line. Fraker, with Thomas present, then lifted the mast without accident to a point where it was perpendicular with the house, thus determining that it could be installed without coming in contact with the high line. Fraker, who subsequently testified without refutation that such action did not lengthen the mast, then placed the antenna upon the mast. After doing so he took the mast and the antenna and placed it in the same position the mast had been in when he first tested for clearance.

Thereupon Fraker and Thomas, with the Thomas children assisting, proceeded to attempt to place the mast and antenna in its proper position. In doing so Thomas took his position at the top or north end of the mast and antenna. Fraker took a position nearer the middle of the mast and the children at the base thereof so that they could help in placing the base end in a hole which had been dug for that purpose.

Having placed themselves as just indicated, Fraker and Thomas lifted the mast and antenna from its horizontal position and proceeded to push it upward in an arc perpendicular to the house for the purpose of placing such mast and antenna in its proper position. It is conceded that while engaged in this operation Thomas was killed as a result of coming into contact with electricity.

Following the death of her husband the plaintiff, Agatha Thomas, was appointed as the statutory representative of his estate. Thereafter she brought this action by filing a petition which is not included in this record. Subsequently she filed an amended petition wherein she alleged facts similar to those heretofore stated; asserted that the antenna either came in contact with or came near the high voltage wire or wires owned and maintained by the defendant; stated that as a result of such contact her husband received a violent shock and died as a result thereof; charged, among other acts of negligence not presently involved, that defendant wrongfully, unlawfully and negligently at the time mentioned and prior thereto, failed to provide for the clearance of its high voltage wire or wires above the ground in accordance with the provisions of "Wire Stringing Rules" of the Kansas Corporation Commission; averred that said acts, without fault or negligence on his part, were the proximate cause of her husband's death; and prayed for the recovery of damages alleged to have been sustained by herself and her children as a result of his wrongful death.

Upon the overruling of its demurrer to the amended petition defendant filed an answer. In that pleading it admitted it was engaged, among other things, in the business of furnishing electricity; averred that if the plaintiff, in fact, had sustained damages as alleged in her amended petition, the same were due to no fault, blame or negligence on the part of it, its agents, servants or employees but were due to the negligent acts of plaintiff's decedent or others than defendant, its agents, servants or employees; and prayed that plaintiff take nothing by reason of her amended petition.

With issues joined as just related the cause came on for trial by a jury. Prior to or during the trial the parties stipulated, subject to a reservation that the stipulations went to the matter of measurements after the accident occurred (1) that the defendant's transmission lines extending from the highway to the transformer pole back of the house carried a voltage of 7,200; (2) that the decedent was killed as a result of coming in contact with electricity; (3) that the span between the defendant's high line pole to the transformer pole back of the house was two hundred sixty-six feet; (4) that the lines at the scene of the accident, the house, the transformer and the poles were substantially the same at the time of the trial as they were at the time of the accident; and (5) that since the date of the

accident defendant's wires had not been changed. Moreover, although not expressly stipulated, it is to be noted that during the progress and trial of the case defendant admitted that after the accident at least one of the two wires of the transmission lines leading to its high line transformer pole was four inches lower than required by the rules of the Corporation Commission. This, it may be added, was a conclusive admission for purposes of the trial and must be considered as binding on the defendant (*In re Estate of Carrell*, 183 Kan. 491, 496, 327 P. 2d 883).

There is some controversy between the parties regarding how high the wires, leading from the pole on the east side of Highway 59 across plaintiff's farm yard to the high line transformer pole near the house, should have been at the time of the accident. If defendant introduced any evidence on this subject, as some arguments advanced by its counsel tend to imply, it was not included in its abstract or in the plaintiff's counter-abstract and is not before us.

The principal evidence adduced by plaintiff on the subject just mentioned, as well as other technical matters which throw much light on the existing factual picture, came from the lips of David E. Shad, a consultant engineer, whose qualifications as an expert are not challenged. Mr. Shad was first shown plaintiff's Exhibits 3 and 4, consisting of page 17 of the Corporation Commission's Rules regarding installation of wires effective on May 24, 1955. These rules were then introduced in evidence.

For reasons indicated the testimony of this witness, as abstracted by the defendant, will be lifted and quoted verbatim from its abstract which reads:

"He testified that referring to the regulations a high wire which extends a distance of 266' between poles should be 21.16' from the ground; that the over-all length of the mast with the antenna attached would be approximately 26'. He computed there would be a 3' clearance between a line and the antenna, assuming that the line was 21.16' above the ground starting with the antenna on the ground so that the base end of said antenna was 20' South of said line. That electricity is generally distributed to a house by two wires from the highline to the transformer and two or three wires from the transformer to the house. The bottom wire on the particular system that he observed out there is commonly known as a neutral conductor; that both wires have voltage in them that change depending upon the load . . . depending upon whether or not there is a limb across the wire; and depending on the resistance of the ground."

*Direct-Examination:*

"Q. Now I want to ask you another question. Assuming that the wire was nineteen feet high and assuming that you laid this television mast and antenna on the ground, and assuming that you measured a distance twenty feet north and lifted this mast and antenna and travelled, moved it in an arc from the ground to the south, would you have an opinion whether or not that antenna and mast would come in contact with that wire which was nineteen feet from the ground. Answer me yes or no.

"A. May I look at that sketch?

"Mr. Russell: Now, if Your Honor please, we object as repetitious. He has already told him.

"Mr. Doherty: That is not the same measurement. The other measurement was twenty-one feet and sixteen hundredths.

"A. No.

"Q. By no, you mean it would not come in contact?

"A. Yes.

"Q. Now, from your study of those rules and regulations, and your experience as a consulting electrical engineer, would you have an opinion as to which of the wires the height definition of the Corporation Commission referred to, the high wire or the lower wire? Answer me yes or no whether you have an opinion.

"A. Yes.

"Q. In your opinion which wire would it apply to?

"A. According to my interpretation of these rules, my opinion would be that both wires were required to have the clearance in this.

"Q. All right. Will you explain to the Court and jury how you arrived at that conclusion?

"A. Well, the Corporation rules introduce certain definitions and their definition states that voltage, in this commission order, means the highest effective voltage between any two conductors of the circuit concerned, except that in the grounded circuit and it has some exceptions but the exceptions do not apply to the case involved here. And that definition of the voltage between the two wires would fall in the seven hundred fifty to fifteen thousand volt class, and on that basis then, when they speak of voltage and labelled requiring clearance, they are talking about both wires associated together to that particular circuit.

"Q. Is that, in your opinion, because oftentimes a low wire becomes hot through accidents?

"A. Yes, sir. The purpose of the clearance rules is to provide clearance for traffic and safety of personnel and everything else, and the bottom wire of the system it's quite possible is hot and it would be a point—there has been a lot of discussion and some change in mind since these rules were written, but at the time of my interpretation of these rules it would require both wires of that to be."

*Cross-Examination:*

"Q. Is it your testimony, on direct examination in this lawsuit, that the ground wire carries the same voltage as the high wire?

"A. I don't believe I made any statement to that effect, No.

"Q. What is the difference?

"A. You say what is the difference? The difference is the difference in voltage. It may or may not be the same voltage as the top wire.

"Q. The ground wire may have practically no voltage in it, is that correct, and usually does not, is that right?

"A. Normally is would be expected to have little voltage."

*Re-Direct-Examination:*

"Q. One question. Mr. Russell asked if normally you would expect to find very little voltage in a low wire and I believe you said that was correct, is that right?

"A. Yes.

"Q. Well, then, if you would expect normally to find very little voltage in a low wire and some man came in contact and was electrocuted, you would think there was something wrong with the system, wouldn't you?

"A. I would think that the system was not normal, we'll say."

In passing it is to be noted Frank Edwards, acting county engineer of Jefferson County, another of plaintiff's witnesses testified that, according to his measurements, at a point where it looked like they attempted to erect the television antenna directly north of the house the height of the lowest wire of defendant's transmission line was sixteen feet.

When, at the close of all the evidence, the case was submitted to the jury it returned a general verdict in favor of the plaintiff along with its answers to submitted special questions which read:

"1. Do you find that deceased, James Thomas, was careless or negligent while assisting in raising the mast with attached antenna? No.

"(*a*) If your answer to question number one above is yes, state what deceased's negligence or carelessness was.

"(*b*) If your answer to question number one above is yes, did deceased's negligence or carelessness cause or contribute to his death?

"2. Do you find that defendant was guilty of negligence which was the sole and proximate cause of deceased's death? Yes.

"(*a*) If your answer to question number two above is yes, state what defendant's negligence was. Failure to install and maintain lines according to State Corporation Commission specifications.

"3. Do you find that the mast or antenna came in contact with defendant's 7,200-volt high line? No.

"(*a*) If your answer to question number 3 is yes, then state the point of contact between defendant's high line and the mast or antenna."

Having set forth, as briefly as the state of the record permits, the facts required to give readers of this opinion a proper understanding of what this case is about, we now turn to the issues.

Since we have decided the case must be returned to the court below for a new trial, where issues now raised may depend on

12

different evidentiary facts and circumstances, we believe it would serve no useful purpose to here detail or labor questions advanced by defendant, raised at different stages of the proceeding, to the effect the record discloses no evidence whatsoever on which to base its liability for negligence. It suffices to say that after an extended review of the entire record; a careful consideration of all the evidence, including the stipulations and admissions to which we have referred, as well as other evidence not included in the foregoing factual recitation; and a study of decisions cited by the parties in support of their respective positions, we have concluded that in the face of the record presented it can neither be said nor held, as defendant contends, that the failure of any evidence of negligence on the part of the defendant establishes as a matter of law that (1) the demurrer to the plaintiff's evidence; (2) the demurrer to all of the evidence; (3) the motion for a directed verdict; (4) the motion for judgment notwithstanding the verdict; and (5) the motion of defendant for judgment on answers to special questions should have been sustained by the district court. This, we may add, holds true notwithstanding defendant strenuously argues that the evidence fails to disclose the height of the transmission lines prior to and at the moment of the accident. The trouble with all arguments advanced by it on this point, as we view it, is that inasmuch as it is conceded that one of such lines was lower than required by the rules of the Corporation Commission and that such lines had not been changed since the date of the accident, the jury, in the absence of proof to the contrary, had the right to assume such lines were of the same height after the accident as they were before.

Again, due to the disposition being made of the appeal, it is neither necessary nor required that we take up time or space in this opinion on questions raised by defendant regarding the conditions and circumstances under which contributory negligence precludes a plaintiff's recovery in a negligence action. Specifically, defendant contends the evidence as a matter of law establishes contributory negligence on the part of the decedent (Thomas) which was the proximate cause of the accident. Mindful of the universal rule in this jurisdiction that the question whether a person has been guilty of contributory negligence must be submitted to a jury if the facts of record are such that reasonable minds, in the exercise of fair and impartial judgment, might reach different conclusions with re-

spect thereto and, having given this question the same consideration as those heretofore mentioned, we are unwilling to say the evidence in this case establishes contributory negligence on the part of the decedent as a matter of law.

In passing it should perhaps be stated that, although not identical from the standpoint of facts and circumstances involved, the conclusions announced in the two preceding paragraphs of this opinion are supported by what is said and held in one of our recent decisions. See *Henderson v. Kansas Power & Light Co.*, 184 Kan. 691, 339 P. 2d 702.

The final claim of error advanced by defendant is that the trial court erred in overruling its motion for a new trial. The principal point raised on this claim is that the jury was guilty of such misconduct as to require the sustaining of its motion.

In view of the confronting facts and circumstances we pause here to note that a jury when accepted becomes a part of the court, and must necessarily act as a unit, and the misconduct of any juror which is sufficient to compel the granting of a new trial is misconduct of the entire jury. (66 C. J. S., New Trial, 162 § 47.)

It should also be stated that basically, whether the misconduct in question was prejudicial is a question of fact, and in the final analysis the result in each case is dependent upon its own facts, for it is only when the misconduct complained of can, in the light of all the circumstances, be said to have influenced the jury's verdict and prevented a fair trial, that prejudice results.

Likewise, it should be noted, that in the consideration of a motion for a new trial for alleged misconduct on the part of the jury each application must be determined mainly upon its peculiar facts and circumstances and should be granted or refused with a view not so much to the attainment of exact justice in a particular case as to the ultimate effect of the decision upon the administration of justice in general. (39 Am. Jur., New Trial, 87 § 73.) And in connection with this particular subject it should be pointed out this court has said (1) that the important question in a motion for a new trial based upon the misconduct of a jury is to determine whether the complaining party was probably prejudiced by such misconduct (*Bryant v. Marshall*, 135 Kan. 348, 354, 10 P. 2d 868) and (2) that for a jury to consider independent facts, unsifted as to their accuracy by cross-examination, and unsupported by the solemnity attending their presentation on oath before a judge, jury, parties

and bystanders, and without an opportunity to contradict or explain them can never be countenanced (*Barber v. Emery*, 101 Kan. 314, 319, 167 Pac. 1044).

It is equally true, as plaintiff contends, that the established rule in this state is that before a judgment will be reversed and a new trial granted because of misconduct of the jury it must affirmatively appear that the substantial rights of the party complaining have been prejudiced thereby. For recent decisions where this rule has been stated, discussed and applied by this court see *Kaminski v. Kansas City Public Service Co.*, 175 Kan. 137, 259 P. 2d 207; *Pulkrabek v. Lampe*, 179 Kan. 204, 293 P. 2d 998; *Randle v. Kansas Turnpike Authority*, 181 Kan. 416, 312 P. 2d 235; *Johnson v. Colorado Interstate Gas Co.*, 182 Kan. 474, 322 P. 2d 781; *Domann v. Pence*, 183 Kan. 135, 325 P. 2d 321; *Logwood v. Martens*, 183 Kan. 534, 331 P. 2d 553.

From what has been heretofore related it becomes obvious further facts and matters must be stated for purposes of determining the question now under consideration. Therefore those deemed essential for its disposition will be stated.

1. The case was submitted to the jury on November 13, 1957, at 1 P. M. The jury came back at 3:42 P. M. for additional instructions. At that time the court asked the foreman if the jury was making progress. His response was "Well, yes and no. It's kind of — In fact I am not sure we'll reach a verdict." Thereupon the court released the jury until the next day.

2. The jury returned on November 14, 1957, and resumed deliberations at 9 A. M. At 9:22 A. M. it returned to the courtroom and requested the testimony of one witness (Mr. Fraker) be read in full. It went back to the jury room at 10:18 A. M. Within a short time thereafter, at 10:56 A. M., it returned to the courtroom with its verdict and answers to the special questions.

3. During argument in this court counsel for defendant asserted the special questions showed on their face that answers to questions 1, 2 and 3 disclosed erasure marks evidencing answers other than those appearing on the special questions had been erased and new answers made to such questions. Defendant then requested and received permission of this court to leave the original files of the Clerk of the District Court of Jefferson County with our Clerk, including the special questions and answers for our inspection. We have since examined the special questions and

answers and while we cannot, of course, determine the reasons for their existence, it may be stated that examination definitely discloses erasure marks beneath the answers made by the jury to special questions 1 and 3.

4. Shortly after the verdict had been returned and the jury discharged one of defendant's attorneys had a conversation with a member of the jury, Leonard J. Noll, in which such juror made statements disclosing misconduct on the part of the jury. Thereafter defendant filed its motion for a new trial, one ground of which was based on that premise.

5. Two hearings were held on the motion for a new trial. During such hearings all of the jurors were called as witnesses. The situation disclosed by their testimony can be highly summarized and, based on our view of its import, may be stated thus:

After the jury was discharged on the afternoon of November 13 juror Noll borrowed a book on electricity from a friend, took it home with him, and thereafter read from it extensively until the early hours of the next morning, paying particular attention to the arcing and jumping characteristics of electricity while being transmitted through electric transmission lines. The next morning, after the jury returned to the jury room to resume its deliberations, he proceeded, in the presence of all the jurors, to discuss with most, if not all, of them matters and things he had learned from the book about the subject in question.

Most of the jurors, if not all, remembered Noll making some statements about the matters just mentioned. The great majority of them testified that they did not pay any attention to his statements, but some admitted that they did so.

6. The defendant asserts there is no evidence respecting arcing or jumping of electricity from the transmission lines presented or submitted to the jury during the trial of the case. Plaintiff makes no denial of this assertion and our examination of the record fails to disclose any evidence of that character.

7. The instructions given to the jury by the trial court prior to the submission of the case disclose that the jury was told that no member thereof had the right to mention any matter or thing which might be known to him and which had not been testified to in open court.

With pertinent facts related it can now be stated that little, if any, time need be spent on the question whether the jury was guilty

of misconduct under the existing facts and circumstances. Plaintiff, with commendable candor, concedes that it was. We may add that even if she had not done so we would have no difficulty in ·reaching the same conclusion. Thus it becomes apparent the all decisive question involved in the present claim of error is whether it appears the substantial rights of the defendant have been prejudiced by reason of such misconduct. Such question, as we have previously indicated, must be determined in the light of the particular facts and circumstances of this case under the rules to which we have heretofore referred.

With salient facts of the case set forth at length, it is neither necessary nor required that we here labor our reasons for conclusions reached respecting the all-decisive question now under consideration. It suffices to say that, keeping in mind the jury's misconduct was with respect to matters having a direct bearing on its answers to all the special questions, particularly those relating to defendant's negligence and the decedent's contributory negligence, we think this is a case where the misconduct in question permeates the findings and the general verdict, at least to the extent it must be said they were not reached by the jury after the fair and impartial consideration to which every litigant is entitled at the hands of the triers of fact in a court of justice. Therefore considering the over-all existing situation, as heretofore outlined, the majority of this court is convinced that the record presented makes it affirmatively appear the defendant's substantial rights were prejudiced by the complained of misconduct of the jury and that, by reason thereof, the trial court should have sustained its motion for a new trial.

The judgment is reversed with directions to grant a new trial.

PRICE, J., dissenting in part and concurring in part: In my opinion the demurrer to plaintiff's evidence should have been sustained on the ground it established, as a matter of law, that decedent's death was proximately caused by his own contributory negligence, thus barring recovery by his personal representative.

Assuming, for the sake of argument, however, the demurrer and similar motions were properly overruled, I concur in the judgment of reversal because of misconduct of the jury.

WERTZ, J. (dissenting): I am unable to agree with the majority opinion of the court insofar as a new trial is ordered on the ground

of abuse of discretion by the trial court, and I set forth my views below.

It is the well-established rule in this jurisdiction that before a judgment will be reversed and a new trial granted because of misconduct of a juror in the jury room, it must affirmatively appear that the substantial rights of the complaining party have been prejudiced thereby. (*Domann v. Pence*, 183 Kan. 135, 325 P. 2d 321; *Johnson v. Colorado Interstate Gas Co.*, 182 Kan. 474, 322 P. 2d 781; *Randle v. Kansas Turnpike Authority*, 181 Kan. 416, 420, 312 P. 2d 235; *Pulkrabek v. Lampe*, 179 Kan. 204, 293 P. 2d 998, 54 ALR 2d 732; *Bohannon v. Peoples Taxicab Co.*, 145 Kan. 86, 64 P. 2d 1; *Clark v. Brady*, 126 Kan. 59, 266 Pac. 740.) There is no presumption that prejudice results from such misconduct. (*Clark v. Brady*, supra, 61; *Pulkrabek v. Lampe*, supra, 208.) Thus, it is incumbent upon the complaining party not only to show and establish misconduct but also to affirmatively establish prejudice affecting the verdict.

Upon the facts of the record, I am unable to agree that the defendant has affirmatively shown prejudice affecting the verdict. It is a well-known fact that electricity will jump or arc from an object which is electrically charged to a metal object coming into close proximity with it. (*Pascoe v. Southern Cal. Edison Co.*, 102 Cal. App. 2d 254, 227 P. 2d 555.) The trial court correctly instructed the jury: "You have the right to take into consideration, in weighing the testimony, . . . any knowledge you may have common to mankind generally that touches upon the matter and things testified about." It was stipulated by defendant that deceased was electrocuted and the jury found that the antenna did not come in contact with the high-voltage wire. The only other conclusion that could be reached, in view of defendant's admission, was that the high-voltage current of electricity jumped or arced into the antenna. Therefore, the jury might properly consider the arcing propensities of electricity even though no direct evidence was introduced on that subject. Defendant, in its brief, argues that every child of ten years knows it is dangerous to come in close proximity to electric wires. Why is it dangerous? Obviously because electricity will jump or arc. Thus, defendant, in effect, admits that the arcing propensity of electricity is a well-known fact.

This court has held that it was not prejudicial for (1) the jury to make use of a dictionary in the jury room during its deliberations (*Pulkrabek v. Lampe*, supra); (2) the jury to take into the jury

room and read a newspaper article concerning the case during its deliberations (*Randle v. Kansas Turnpike Authority,* supra); (3) a juror, in a pipe-line condemnation case, to state that "pipe lines never made him a dime"; that "the more you can get out of them the better he would like it"; that "he was 'against pipe-lines'"; that "they [the pipe-line companies] were 'paying $2.00 per rod per year in Texas and Oklahoma'," and that "he knew what pipe-line companies made from lines like this one and there was no reason why landowners should not be well paid." (*Johnson v. Colorado Interstate Gas Co.,* supra, 476.) In *Domann v. Pence,* supra, we held that the jury's remarks, made during deliberation outside the evidence, as to whether defendant was covered by liability insurance were not prejudicial. While the conduct of the juror in question may have been improper, it cannot be said to have been prejudicial when measured by the yardstick of both reason and the long-established precedent of this court.

Moreover, the jury returned its verdict and was discharged by the court before any objections with respect to misconduct were raised. The defendant then proceeded to "try the jury" at the hearing on the motion for a new trial. This was as improper as the alleged misconduct of the juror. It has long been the rule, founded upon public policy, that jurors will not be permitted to impeach a verdict to which they have deliberately agreed under the sanction of an oath. There would be little virtue or finality in verdicts if they could be impeached and overthrown by the evidence of jurors and litigants. It has been said that such a situation would result in perjury and bribery and there would be no end to litigation in cases tried before juries. (*State v. Buseman,* 124 Kan. 496, 499, 260 Pac. 641; *Ohlson v. Power Co.,* 105 Kan. 252, 254, 182 Pac. 393; *Jones v. Webber,* 111 Kan. 650, 652, 207 Pac. 837; *Henderson v. Deckert,* 160 Kan. 386, 162 P. 2d 88; *Newell v. City Ice Co.,* 140 Kan. 110, 112, 113, 34 P. 2d 558; *Anderson v. Thompson,* 137 Kan. 754, 22 P. 2d 438; *Hurley v. Painter,* 182 Kan. 731, 736, 324 P. 2d 142.)

In *Anderson v. Thompson,* supra, 758, Mr. Justice Rousseau Burch, speaking for the court, said:

"Public policy forbids that after the jury has tried the case the court shall, on motion for new trial, proceed to try the jury. A verdict may not be impeached by an inquiry which reaches a juror's views or the reasons for those views (*L. & W. Rly. Co. v. Anderson,* 41 Kan. 528, 21 Pac. 588), or which reaches what influenced those views (*Matthews v. Langhofer,* 110 Kan. 36,

202 Pac. 634; *Jones v. Webber,* 111 Kan. 650, 207 Pac. 837; *Stone v. City of Pleasanton,* 115 Kan. 378, 223 Pac. 312). Besides that, the jury being what it is, jurors will act like human beings in the jury room, and will indulge in bluster and hyperbole and animated irrelevancies. Not only does the law presume a juror respects the obligation of his oath and votes his convictions, but generally he in fact does so; and due allowance must be made for some exuberance in jury-room discussion or the court must keep on granting new trials in important cases until a perfectly spiritless jury can be secured."

All trial judges and lawyers in this state are aware of the fact that it is difficult to obtain jurors. If jurors may, with propriety, be subjected to harassment after they have rendered their verdict, then the task of selecting jurors will be made still more difficult. Such, I fear, will be the result of the holding of the majority opinion, and I cannot adhere to it. If objections are going to be raised on the ground of misconduct of the jury, they should be raised at the time the jury is polled and, of course, each party may ask for a polling of the jury. Such objections should not be permitted to be raised after the verdict has been rendered and the jury discharged, or there will be no end to litigation where a jury trial is had.

There is another sound reason why, in my opinion, the ruling of the trial court should be affirmed. After carefully considering the record of the trial and the hearing on the motion for a new trial, the trial court was of the opinion that the verdict should be, and it was, approved. Perhaps no rule of law is more firmly established and well settled than the rule that an order by the trial court allowing or denying a motion for a new trial will not be reversed by this court, unless an abuse of sound judicial discretion is clearly apparent. The only question for review is whether such discretion has been abused. (*Pulkrabek v. Lampe,* supra, 210; *McFadden v. McFadden,* 179 Kan. 455, 463, 296 P. 2d 1098; *Baker v. City of Leoti,* 179 Kan. 122, 127, 128, 292 P. 2d 720; *Clark v. Southwestern Greyhound Lines,* 146 Kan. 115, 69 P. 2d 20; *Bateman v. Roller,* 168 Kan. 111, 112, 211 P. 2d 440; *Simon v. Simon,* 69 Kan. 746, 748, 77 Pac. 571; *Investment Co. v. Hillyer,* 50 Kan. 446, 448, 31 Pac. 1064; *Atchison, Topeka and Santa Fe Railway Co. v. Jackson,* 235 F. 2d 390, 394.)

With respect to the exercise of the mentioned sound judicial discretion, it has been said:

"The discretion of district courts in the matter of granting or refusing new trials is a legal, not a capricious, one. It must be warranted by law and

guided by established precedent. It may not be exercised simply because the judge might wish the verdict to be otherwise. The applicant therefor must show a legal reason for its exercise. The saying that it takes thirteen to render a verdict has passed to an adage, but can mean nothing more than that, in cases where conflicting evidence raises a substantial and serious doubt in the mind of the trial judge of the correctness of the conclusion reached by the jury, he *may* interfere; . . ." [Emphasis supplied.] (*Sovereign Camp v. Thiebaud*, 65 Kan. 332, 337, 69 Pac. 348; *Butler v. Milner*, 101 Kan. 264, 268, 166 Pac. 478.)

In the recent case of *Reedy v. Reedy*, 175 Kan. 438, 440, 264 P. 2d 913, we said:

"Discretion may be defined as the freedom to act according to one's judgment. Judicial discretion implies the liberty to act as a judge should act, applying the rules and analogies of the law to the facts found after weighing and examining the evidence—to act upon fair judicial consideration, and not arbitrarily. When so acting in a matter committed to the discretion of the court by the law *the judgment ought not to be overruled by a reviewing court*, for to do so would be to deny the right to exercise the discretion given by the law itself. [Citing cases.]" [Emphasis supplied.]

Thus, in order to warrant a reversal in the instant case, it must appear that the trial court abused its discretion. Let us see if that is the case. In ruling upon the motion for a new trial, the trial court prepared a memorandum opinion setting out the contentions of the parties, the evidence presented at the hearing and the applicable rules of law, including that relating to prejudice affecting the verdict. It was stated that the conduct of the juror Noll was "reprehensible and should subject the juror to reprimand, yet the question remains, 'Was the substantial rights of the defendant prejudiced thereby?'"; and further:

"Most of the other jurors remembered Noll making some statement but their testimony was substantially that they didn't pay any attention to it. In view of the fact that defendants admit death as a result of electric shock, how could the wrongful action and statements of Noll have influenced the jury in their verdict? . . .

"Since defendant admitted cause of death, it was only necessary, in arriving at their general verdict, for the jury to determine the question of negligence, and a specific finding of negligence to support the general verdict was made . . .

"Therefore, the Court concludes that even though the actions of the juror Noll cannot be condoned, it cannot be said that such resulted in substantial prejudice to defendant's rights."

Thus, the court was exercising a sound legal discretion guided by established precedent and was not exercising an arbitrary or capri-

cious one. Under such circumstances, this court should be bound by the result reached by the trial court and the mere fact that some of the members of this court might believe the case was one where, with propriety, a new trial might have been granted does not justify disturbing the conclusion reached by the lower court. (*King v. Consolidated Products Co.*, 159 Kan. 608, 612, 157 P. 2d 541; *Pittman Co. v. Hayes*, 98 Kan. 273, 278, 157 Pac. 1193; *Butler v. Milner*, supra, 268.)

We stated in our recent case of *Pulkrabek v. Lampe*, 179 Kan. 204, 293 P. 2d 998, 54 A. L. R. 2d 732:

"From the record presented it appears that the trial court, which we pause to note was *in much better position to pass on the situation than this court*, was convinced that the misconduct of the jury was not such that prejudice therefrom resulted against the appellant." [Emphasis supplied.]

We further said, after approving the rule as laid down in 39 Am. Jur., New Trial § 73, p. 87, that in connection with such rule it may be stated that this court has *always* held that an order overruling or denying a motion for a new trial *will not* be reversed unless abuse of discretion by the trial court is apparent. Numerous other decisions of like import appear in our reports, but to cite them would merely burden this opinion. They can be found by referring to West's Kansas Digest, Appeal & Error, §§ 977-979, incl., and Hatcher's Kansas Digest (Rev. Ed.), Appeal & Error, §§ 458, 459.

In *Newell v. City Ice Co.*, supra, 113, in speaking of a juror injecting insurance into the case during deliberation, we said:

"Where it is mentioned in the jury room and outside of the evidence without the knowledge or participation of the successful party, it has been held that much liberality is indulged in sustaining the verdict notwithstanding such misconduct."

An able trial judge, with years of experience on the bench, heard the evidence on the merits of this case and the evidence presented on the motion for a new trial, on which he wrote a lengthy memorandum opinion, narrating the evidence, citing the authorities of this court upon which he relied in overruling the motion; and he was in a much better position than this court to pass on the question. I cannot say, after reading the record, that he abused his discretion in refusing to grant a new trial, and I find no justification therein for reversing this case. It appears to me that the majority of the court have usurped the powers and functions of the trial court after reading only the cold record. Much more could be said, but,

in the interest of some brevity, under the existing conditions I will refrain. I am of the opinion the judgment of the trial court should be affirmed *in toto*.

ROBB and FATZER, JJ., concur in the foregoing dissent.