No. 32,352

THE STATE OF KANSAS, *Appellee,* v. ESTHER EIDSON, *Appellant.*

(54 P. 2d 977)

Opinion filed March 7, 1936.

*Eugene W. Davis,* of Liberal, and *L. L. Morgan,* of Hugoton, for the appellant.

*Clarence V. Beck,* attorney general, *Earl B. Swarner,* assistant attorney general, *H. A. Gaskill,* county attorney, *Charles M. Tucker* and *Charles Vance,* both of Liberal, for the appellee.

The opinion of the court was delivered by

SMITH, J.: In this action defendant was charged in one count with aiding and abetting in an assault with intent to rob; in the second count with assault with intent to rob by aiding and abetting; in the third count with aiding one who she knew had committed an assault with intent to rob, to escape, by concealing from the officers the name of the person who had committed the robbery. The state dismissed the first count. Defendant was convicted of the second and third. She appeals.

The assault took place in a drugstore in Liberal on June 21, 1934, about 9:45 p. m. A short time before that, defendant and her daughter had been in the Smith drugstore. At the time of the rob-

bery the daughter had gone out and stood on the street in front of the store. Defendant was visiting with the daughter-in-law of the proprietor near the front of the store when a man afterwards identified as Frank Colby entered. Colby accosted Roy Smith, who worked for his father in the store. He told Smith, "Well, you do just what I tell you and there won't be anybody hurt." Acting under directions of Colby, Roy Smith went back to the cash register, got the key to the front door, returned and locked it and turned out the lights in the store. Roy Smith then told his wife and defendant, who were visiting together, that Colby wanted them all to go to the back of the store. They all went back. T. J. Smith, the proprietor, was in the rear of the store when he first saw his son and Colby. Roy Smith told his father that Colby wanted them all to go in back. After the lights in front had all been turned out the only light left burning was the one behind the prescription case, which partially lighted the whole store. When they were all behind the prescription case Colby ordered them all down to the basement. All present, including T. J. Smith, Roy Smith and his wife, a clerk in the store named Locke, the defendant and Colby, went to the basement. They stayed there about five minutes. After they reached the basement there was considerable conversation between Smith and Colby about whether anyone there knew the combination to the vault that was in the basement. Finally Smith convinced Colby that the only person who could unlock the vault was six blocks away and could be reached by telephone. It seemed for a while that Colby was going to tie up everybody there, and take one of them to get the man who could open the vault. This idea was evidently given up, and they went upstairs. As they all went back upstairs T. J. Smith broke away, escaped through a door in the back end of the store and gave the alarm. About the same time Colby broke out a window and escaped.

There was a shooting affray the next evening between Colby and an officer. They were both wounded. Colby managed to get out to the home of some of his relatives in the country near Liberal. He was surrounded there early in the morning of June 23. Rather than give himself up to the officers he put a bullet through his brain.

The evidence against defendant was all circumstantial. Defendant urges, among other things, that she should have been discharged at the close of the evidence of the state because it was not sufficient to prove a case against her. She also urges that the trial court

should have granted her a new trial. On account of the nature of the claims argued, the evidence will be examined in detail.

T. J. Smith testified about as has been given here. He testified that while they were all in the basement defendant was within hearing distance of Colby. He also identified Colby as the same man who had kidnaped him a few months before. He also testified that Colby had never been in the basement of the store, and defendant had been.

Roy Smith, in addition to corroborating the evidence given by his father, testified about as has been heretofore set out. He also testified that when he and his wife came into the store, a short time before the attempted robbery, defendant and her daughter, Carrie Duvall, were the only customers in the store; that when they came upstairs out of the basement defendant was in front of him; that he did not see defendant reach for the phone; that other than the fact that Colby wore colored glasses there was no attempted disguise; that Carrie Duvall was in the store when he came, but she left a few seconds afterwards; that immediately after Colby had jumped through the window defendant showed him her hand, which she claimed Colby had struck when she reached for the phone; that it was not bleeding or black and blue, but was a little bit red.

Locke testified that defendant bought a jar of cold cream, and when she went to pay him she said, "It looks like I might have lots of money," and, "If anybody would tell me to hand over what I have got I would hand it over." He testified that defendant said that "Mr. Summers (president of the Citizens State Bank and owner of Chas. Summers & Sons store) had instructed his clerks if any holdup should come in there to do whatever they said." He also testified that on the night in question Colby was dressed in blue-rib overalls with a cap and a pair of dark glasses.

Holland Davis testified that he knew defendant; that he worked on the Eidson ranch in Stevens county in 1929, and Colby worked there at the same time; that he saw Colby at the Eidson ranch again the following spring; that he saw Colby afterwards in April of 1934 on the streets of Liberal, and also at Mrs. Akers' house, where defendant was staying; that Colby had not changed in appearance from the time he saw him in 1929 and 1930 until the time when he saw him again in 1934; that at the time when he first saw Colby on the streets of Liberal, Colby inquired where defendant lived, and that witness told him, and it was later the same day

in the afternoon that he saw Colby out at the Akers house talking to defendant; and that Colby had a scar on the left side of his face extending over across his nose, and that Colby was "kinda hatchet-faced."

Claude E. Blair testified that he viewed the body of Colby, and that it was the body of the same man whom he saw at the Eidson sale during June, 1934; that this man was helping around the sale and showed him a truck.

Tom Novinger testified that he lived ten miles north of Plains; that his son had known Colby during his lifetime; that Colby came to his place about seven o'clock on the morning before the holdup; that Colby was driving a dark-green Chevrolet car covered with red mud and bearing an Oklahoma license plate; that the car was equipped with a radio; that Colby played the radio for them; that he saw the same car afterwards in a garage in Liberal; that the mud and license plate were still on it, but there was no radio; that Colby was dressed in blue overalls, wore a gray hat and a blue shirt and was probably five feet ten inches tall and would weigh about 150 pounds, was tanned more or less, was light complexioned, and was probably thirty-five years old, was of narrow face, and what you would ordinarily call "hatchet-faced."

Mrs. Roy Smith corroborated the testimony that has already been described herein. She also testified that defendant looked at Colby and asked her what that man wanted and whether she knew him, and that on the way to the rear of the store she asked, "Well, what do you suppose he wants?" or, "What does this mean?" She testified that as defendant went past the telephone at the side of the prescription case Colby was in front of it; that she did not see defendant make any attempt to reach the telephone. She testified further that when the bandit ordered them all back to the rear of the store she looked outside and nodded to the daughter of defendant, so that she would see what was going on and call help. This witness was then permitted to testify, on cross-examination, that after Colby jumped through the window she told defendant she thought Colby had talked to the daughter of defendant before he came into the store. She then testified that defendant told her that Colby had asked the daughter to buy him some cigarettes.

George Chaffin testified that at the time of the attempted holdup he was running a filling station in Liberal; that a man whom he afterwards learned was Colby came to his filling station on that

night; that he was back on the following day and asked him if he knew the station that Mrs. Eidson had leased, and he told him he did not know of it; that he called an officer, who talked to Colby a few minutes; that he knew that defendant did not have any station leased.

C. J. Malone testified that he was an inspector at the port of entry at Liberal; that in a conversation with Colby at a filling station Colby asked him if defendant did not run that station; that he saw Colby at the Bussell cottage camp, and when he attempted to put him under arrest Colby ran, and they exchanged shots; that when he first saw Colby he asked whom he was looking for, and he said, "I want to see Mrs. Eidson."

E. C. Lepper testified that he was chief of police of Liberal; that on the morning after the attempted holdup he found an abandoned 1934 Chevrolet sedan covered with red-colored mud and with an Oklahoma license tag on it; that the car was not equipped with a radio, but he could tell that it had been. He testified further that he went with the sheriff to interview defendant; that the sheriff asked her if there was anybody around there who could fit Colby's description, and she said, "No, . . . I believe I could identify him"; that he found out that the car belonged to a man in Ponca City, Okla., and was a stolen car; that on the evening of the attempted holdup he was across the street from Smith's.

L. E. Warden testified that he was the sheriff of Seward county; that he had been acquainted with defendant for seven or eight years and had known Colby since 1929; that defendant gave him a description of the bandit as a man about five feet nine inches tall, slender build, hatchet-faced, wearing a cap and a pair of glasses, overalls, and either a coat or a shirt; that defendant showed him her hand which she said the bandit had hit, and he could see nothing wrong with it; that he asked her if she had any idea who it was, and she said, "No"; that he and other officers searched the cabin in which defendant lived; that they found a car radio; that the one showed him in the courtroom was similar to the one found in the cabin of defendant; that it was in a pasteboard box; that he afterwards arrested defendant on a farm; that at that time he asked her where the radio was, and she informed him that she had taken it to the granary; that he afterwards found the radio in the granary. He testified that he had the numbers of the radio with which the abandoned car had been equipped, and they were the same as the

numbers on the radio that was in the courtroom; defendant claimed she had found this radio in the evening of the 21st of June on the way to Liberal. He further testified that there was something peculiar about Colby's features, in that "he was hatchet-faced, slim-faced, and long, peaked nose"; that on the night of the holdup defendant gave him a description of Colby and it was not a bad description; that when he saw Colby's body on the night of June 23 he had not changed a bit in his personal appearance since he had first known him in 1929.

When the state had finished the introduction of the above evidence defendant filed a motion to discharge, which counsel refers to as a demurrer to the evidence. The court required the state to elect as between counts 1 and 2. The state elected to stand on count 2. Count 1 was dismissed and the motion to discharge was overruled as to counts 2 and 3.

When defendant took the stand in her own defense her first testimony was a detailed account of her whereabouts during the day of June 21. She testified that she was not in Liberal during that day until just before she went to the drugstore. She testified that she became acquainted with Colby when he worked for her in December, 1928, and January, 1929; that they had six men hired at that time; that she had never seen Colby from that time until she saw him in the mortuary after his death. The balance of the evidence offered by defendant was a denial of the various times when witnesses had said they had seen her talking to Colby or seen Colby at her ranch.

C. B. Nelson testified that he was across the street from the Smith drugstore; that some lady came across the street to Lepper, the chief of police, and she and Lepper went back over to the store; that he followed them over; that they looked in the front window and saw no one, and went around to the middle door on the north side where Doctor Smith, the brother of Smith, the druggist, had his office; that there Lepper talked to Doctor Smith, who told them nothing was going on.

Carrie Duvall testified that while she was standing outside the store she saw Mrs. Roy Smith look at the men and then at her and then nodded; that she knew something was wrong and went across the street to Chief of Police Lepper and told him something was wrong in the drugstore, and described the man she saw, and went

with the chief to the side door, where they talked to Doctor Smith and were told that nothing was wrong.

At the close of the evidence offered by defendant the state asked permission to endorse the names of three witnesses on the information for the purpose of rebuttal. Over the objection of defendant, this permission was given. Two of these witnesses contradicted the testimony of defendant as to discrepancies between statements she was said to have made and her testimony. It is to the testimony offered by a third witness that our attention is drawn.

Benton Jones testified that about noon on June 21 he talked to Colby on the streets of Liberal, and that about one o'clock on that day he again saw and spoke to Colby, and at that time Colby was talking to defendant and her daughter. Defendant objected to the admission of this evidence on the ground that it was properly a part of the state's case in chief. On the hearing of the motion for a new trial the affidavit of a bank cashier from Moscow was presented, wherein the cashier stated that defendant was at the bank in Moscow at the hour when Jones swore he saw her in Liberal talking to Colby. The affidavit of a truck driver was also offered to the same general effect. The trial court overruled the motion for a new trial. Our question is whether the admission of the rebuttal evidence and denying the motion for a new trial was reversible error.

At best the case against defendant was not a strong one. The state points out that defendant had known Colby in his lifetime; had talked to him during the spring of that year some months before the attempted robbery, and had some property in her possession soon after the robbery which had been in the possession of Colby a short time before. From these facts it is argued that she must have aided and abetted Colby in the robbery of the Smith store. There was no evidence offered as to anything that happened at the scene of the offense which would tend to strengthen the state's case. In such a case, then, the evidence of Benton Jones was a part of the case in chief of the state. The fact, if it was a fact, that defendant and her daughter were talking to Colby on the streets of Liberal at noon on the day of the robbery would be a much stronger circumstance than any of those relied upon.

It is obvious that this evidence was not offered to rebut anything said by defendant during her defense. The state had made no issue as to her whereabouts and movements during the day of the 21st.

Her testimony in that respect was not offered as an alibi. The nature of the offense with which she was charged was not such as could be met with an alibi. The statute requiring names to be endorsed on the information before trial is intended to enable the defendant to guard against surprise at the trial. This court has gone a long way in holding that the trial court has a wide discretion as to permitting additional names to be endorsed on an information after the trial has started. We never have held, however, that such a thing should be permitted when it resulted in prejudice to the rights of defendant. (See *State, ex rel., v. Stout,* 101 Kan. 600, 168 Pac. 853.) The same is true of the right of the trial court to reopen a case after it has been closed for the purpose of receiving further evidence. In this case the state asked permission to endorse the name of the witness who testified as to the incident in Liberal at noon on the 21st just before he took the stand. The defendant did not have sufficient opportunity to meet this most damaging and climactic piece of evidence. In a case based altogether on circumstantial evidence such as this, it appears that the use of this evidence when it was introduced was prejudicial to the rights of the defendant. An examination of the affidavits offered on the hearing of the motion for a new trial discloses that the evidence available to defendant to meet the evidence of Jones was of substantial merit. There was a strong liklihood that had the jury heard this evidence a different verdict might have been reached. The situation could not have been met by allowing defendant time to meet this evidence. At the point in the trial which had been reached when this incident occurred, it would not be surprising if defendant could not think offhand how she might meet such evidence. We hold that the trial court abused its discretion in overruling the objection of defendant to the introduction of the evidence of Benton Jones and in denying the motion of defendant for a new trial.

The judgment of the trial court is reversed, with directions to allow defendant a new trial.

BURCH, C. J., dissenting.

HARVEY, J. (concurring specially): I concur in the judgment of reversal. I also concur in the view that it was error to permit the testimony of the witness, Benton Jones, to be given at the time and under the circumstances it was presented at the trial. It is my view

that, standing alone, perhaps that error would not require a reversal, but the affidavits offered by defendant in support of her motion for a new trial thoroughly discredited Jones's testimony and indicates that he was at least entirely mistaken about what he testified to. On that showing it was error for the court to refuse a new trial. As stated in the opinion, the state's case against the defendant was weak at the best. Aside from the testimony of Jones, the testimony offered to support the state's case was as consistent with her innocence as with her guilt, and much of it actually tended to prove innocence.