No. 46,725

STATE OF KANSAS, *Appellee,* v. DOROTHY R. BLOCKER, *Appellant.*

(505 P. 2d 1099)

Opinion filed January 20, 1973.

*Robert L. Marietta*, of the firm of Marietta, Kellogg & Lord, of Salina, argued the cause, and *Charles S. Scott*, of the firm of Scott, Scott, Scott & Jackson, of Topeka, was with him on the brief for the appellant.

*Bill Crews*, county attorney, argued the cause, and *Vern Miller*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: This opinion chronicles an unhappy train of events culminating in death and a murder conviction. The principals in the tragedy, Dorothy Blocker, the defendant, and Edward Russ, the deceased, had been intimately associated for some three years, although the relationship had become bitter and argumentative during the last three months. Edward Russ was a cross-country truck driver. He was a married man, no stranger to violence, and

he nurtured a jealous disposition. Dorothy Blocker was an unmarried woman at the time, and was possessed of four minor children ranging in ages from eight to fifteen years. We shall refer to Dorothy Blocker either as defendant, Mrs. Blocker or Dorothy, and to Edward Russ either as Russ or decedent.

On the day of the homicide, January 31, 1970, Russ returned from a two-week trip to California, during which he had called Dorothy on several occasions. He arrived at the Blocker home shortly after noon and found that Dorothy and a woman friend had gone to Gene Stanley's house, taking Dorothy's record player with them. Russ obtained the keys to Dorothy's car by forcing the glove compartment and, taking Dorothy's eight-year-old son Glenn with him, went to get his inamorata. He parked the car in front of the Stanley home, left Glenn in the car, and went into the house where he angrily told Dorothy to come with him, and this she did. On returning to the car Russ struck Dorothy in the face with such force that she fell to the floor of the car and involuntarily urinated. Russ drove the car back to the Blocker home where another physical encounter took place in which Dorothy was pushed against the side of the car and her wrist watch broken. The facts from there on are somewhat conflicting but the end result was that Dorothy pulled a small gun from her purse and fired three shots, one of them striking Russ in the back and causing his premature demise. The time was shortly after 1 p. m.

Charges of murder in the second degree were filed against the defendant for which she was tried and convicted. She was sentenced to a term of twenty years and brings this appeal.

Four of her grounds of error relate in one way or another to the admission of her picture taken at the police station about six hours after the homicide occurred. The picture was identified on rebuttal by Officer Richardson. His name was not endorsed on the information prior to trial but leave was obtained to endorse it when the defense rested. The purpose of introducing the picture was to rebut the testimony of five witnesses that Dorothy's face was bruised and swollen and her eye partially closed.

It is contended the court erred in permitting the endorsement of Richardson's name after the defense rested; in permitting him to testify inasmuch as he remained in the courtroom in violation of an order excluding witnesses; that his testimony was not rebuttal, but evidence in chief; and that it impeached the testimony of other state witnesses.

K. S. A. 1971 Supp. 22-3201 (6) provides that the prosecuting attorney shall endorse on the information the names of all witnesses known to him at the time of filing and may endorse the names of other witnesses thereon as may afterward become known, at such times as the court may by rule or otherwise prescribe.

On several occasions this court has considered late endorsements as they related to the foregoing statute and its predecessor, G. S. 1949, 62-802. From our decisions the rule has evolved that permission to endorse additional names on the information during trial rests within the sound discretion of the trial court, and its ruling will not be disturbed in the absence of abuse—the test being whether the defendant's rights have been prejudiced. (*State v. Foster*, 202 Kan. 259, 447 P. 2d 405; *State v. Poulos*, 196 Kan. 287, 411 P. 2d 689; *State v. Hendrix*, 188 Kan. 558, 363 P. 2d 522; *State v. Thomas*, 173 Kan. 460, 249 P. 2d 645.)

It is urged that Officer Richardson's testimony identifying the defendant's picture was not rebuttal evidence, but evidence in chief, and should have been offered during the state's case. Resolution of this question depends on whether or not the defendant's right to a fair trial was substantially prejudiced. In *State, ex rel., v. Stout*, 101 Kan. 600, 168 Pac. 853, the same point was raised. There, evidence which would have been admissible in chief was introduced by way of rebuttal, and the trial court refused to permit the defendant to offer evidence to rebut the rebuttal. In the course of its opinion this court said:

". . . It is within the discretion of the trial court to admit in rebuttal facts which should have been offered in chief. This rule appears to be supported by the weight of authority (12 Cyc. 557). It has been held also within the discretion of the trial court to reopen the case at any time before its final submission and permit either the prosecution or the defense to offer evidence; but it has been held that when the prosecution has been permitted to offer new evidence on a material point, after the defendant has closed his case, it is error to refuse defendant permission to call witnesses in rebuttal. (12 Cyc. 561, and cases cited in note.) The ruling of the court will not be ground for reversal unless it appear that the discretion has been abused to the defendant's prejudice. (*Bolen v. The People*, 184 Ill. 338; *People v. Kindra*, 102 Mich. 147.) But where, as in this case, the court has permitted the prosecution to prove material and relevant facts of its case by way of rebuttal which should have been offered in chief, and denies defendant the right to introduce testimony to rebut such material and relevant matter, we think the ruling must be regarded as reversible error. . . ." (p. 604.)

In a somewhat more recent case, *State v. Beam*, 175 Kan. 814, 267 P. 2d 509, this court held:

"Under the provisions of G. S. 1949, 62-1438, the trial court in a criminal case may, for good reason and in the furtherance of justice, admit evidence for the prosecution in rebuttal even though some of such evidence might have been introduced in the case in chief." (Syl. ¶ 2.)

Viewing the approach taken in the *Stout* case as sound, we proceed to consider the circumstances under which the court's ruling was entered. We entertain no doubt the state was well aware of Richardson's availability as a witness and what his testimony might be. Mr. Crews, the county attorney, conceded as much before the court. The state was also aware, from evidence adduced at the preliminary hearing, that there were differing accounts as to the condition of Mrs. Blocker's face following the homicide.

Nonetheless, Mr. Crews told the trial court he had not intended to call Richardson to the stand until Mrs. Blocker, in her own defense, presented the testimony of five additional witnesses, who had not appeared at the preliminary hearing, that the defendant's face appeared bruised and her eye was swollen when they saw her at the police station that evening. Under these circumstances we cannot fault the state for requesting leave to introduce evidence in rebuttal. But whether or not the state might have used Richardson in its case in chief is not too material, for under the rationale of *Stout* the trial court was vested with discretion to admit the rebuttal testimony in any event, provided the defendant would not be prejudiced thereby.

The key to the matter is prejudice. Was Mrs. Blocker substantially prejudiced by the court's ruling? We would be hard put to say that she was. The argument over whether Mr. Richardson should be allowed to testify arose in the afternoon. The trial court exhibited considerable doubt as to what its ruling should be, and finally announced that since the trial could not be concluded within the day, the court would be recessed and the jury excused until the morrow. In the meantime, said the court, some authority might be found in the county law library.

On the following morning the court overruled the defendant's objection to Richardson's rebuttal testimony. The defense thereupon requested a continuance of "a couple of days or so." This was denied, but about 10:30 or 11 a. m. the court declared a recess until 1:30 to give defense counsel time to question Richardson, who was

just outside the courtroom, and to contact Salina photographers.

Mr. Richardson's testimony appears to have been brief and his cross-examination skillfully conducted. He testified the film was underexposed, no adjustment was made in the camera setting for the defendant's dark skin, no light meter was used and Dorothy's hair was not as dark as it now appeared to be—because of enlargement which causes a graying in the picture.

The defendant offered evidence in surrebuttal—which distinguishes this case from *State, ex rel., v. Stout,* supra, where surrebuttal was denied. Mr. Ernest Vishnefske, a portrait photographer with twenty-three years experience under his belt, testified that the negatives were thin, lacking in detail and about 20% underexposed, which would result in loss of detail and range of contrast; that the face was narrowed on one side and enlarged on the other due to the way it was positioned; and that there is considerable difference in light reflection between a light and dark face, the ratio being four or five to one, which means that in photographing a dark face a compensating exposure of four times would be needed. Mrs. Blocker also testified on surrebuttal that the picture was taken sometime after 7 p. m.

We believe no prejudice can be inferred from the manner in which the court handled this matter. The granting of a continuance lies within the sound judicial discretion of the trial court (2 Hatcher's Kansas Digest [Rev. Ed.] Continuance, § 1) and we believe no abuse has been shown. The defendant was permitted to offer surrebuttal testimony and was able to produce a well qualified photographer whose expert opinion was doubtless given a good deal of emphasis by the defense in closing argument.

The situation here is quite different from that shown in *State v. Eidson,* 143 Kan. 300, 54 P. 2d 977, cited by the defendant, where the state asked permission to endorse the name of a witness just before he took the stand, and the defendant had no opportunity to meet his evidence. In the present case it can hardly be said that the defendant was suddenly taken by surprise. She had known since the previous afternoon that the state planned to use Mr. Richardson in rebuttal, and a considerable time intervened before he was actually called to the stand—time which was obviously put to good use in securing respectable surrebuttal testimony.

As to the complaint that Richardson remained in the court room after the witnesses were excluded therefrom, this court has held

that violation of a court order separating witnesses does not disqualify a witness from testifying, and that the court in its discretion may admit his testimony. (*State v. Henderson,* 205 Kan. 231, 240, 468 P. 2d 136; *State v. Edwards,* 209 Kan. 696, 697, 498 P. 2d 53; *State v. Trotter,* 203 Kan. 31, 37, 453 P. 2d 93; *State v. Smit,* 184 Kan. 582, 585, 337 P. 2d 680. Furthermore, Richardson was not listed as a witness, nor was he expected to be used, when the separation order was made.

The argument that Richardson's testimony impeached testimony given by other state witnesses, and hence was inadmissible, is without merit. His testimony simply tended to contradict statements of other witnesses used by the state that defendant's face was bruised and swollen. In *Amerine v. Amerine, Executor,* 177 Kan. 481, 280 P. 2d 601, we addressed ourselves to this subject in these words:

". . . [T]he rule that a party may not impeach his own witness does not mean that if the first witness testify to a certain fact, a later witness is barred from testifying to the contrary on any theory the latter witness is impeaching the first—the rule is that a party is not concluded by the statement of any witness but has the right to introduce other competent proof to show the fact even though the latter testimony may contradict or impeach the testimony of the previous witness. . . ." (p. 485.)

Moreover, under K. S. A. 60-420, any party may examine a witness, including the party who called him, on matters going to credibility and may introduce extrinsic evidence relevant to that issue.

The defendant contends the trial court erred in overruling her motion for directed verdict. She argues that she acted in self defense and without malice or purpose; that she was being unlawfully attacked by the decedent and used only such force as reasonably seemed necessary to her in repelling the attack. In short, her position seems to be that the evidence established self defense as a matter of law.

Examining the record it is not difficult from a sentimental or emotional standpoint to feel compassion for the defendant's plight. That she had been subjected to abuse by the deceased is not open to question. But we are bound by the evidence shown in the record and in view of its conflicting character we are forced to conclude that a factual question was presented for the jury to resolve. Hence our duty on appeal is to determine whether the verdict is supported by substantial competent evidence. (See 1 Hatcher's Kansas Digest [Rev. Ed.] Appeal & Error, § 495.)

K. S. A. 21-404, in effect when the homicide occurred, provides:

"Homicide shall be deemed justifiable when committed by any person in either of the following cases: . . . *second,* when committed in the lawful defense of such person, or of his or her husband or wife, parent, child, master, mistress, apprentice, or servant, when there shall be a reasonable cause to apprehend a design to commit a felony, or to do some great personal injury, and there shall be immediate danger of such design being accomplished . . ."

Our present statute, K. S. A. 1971 Supp. 21-3211, effective July 1, 1970, reads:

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

Both statutory enactments embody the generally recognized concept that a person may lawfully use such force as may reasonably seem necessary to him or her in defending one's self against unlawful attack and serious bodily harm, but may not go further than appears reasonably necessary for such purpose. (40 Am. Jur. 2d, Homicide, § 139, pp. 429, 430.)

There is evidence, it is true, that when Mrs. Blocker fired at Russ, he was advancing toward her. She herself so testified and there is other evidence lending support to her version. On the other hand it is undisputed that he was shot in the back and there is evidence he was running toward the house when all three shots were fired. Glenn Blocker, Dorothy's young son who was in the car at the time, testified in part:

*Cross-examination*

"Q. Now, did you see a gun in your mother's hand?
"A. Yeah.
"Q. And did you see the gun fired? Did you see it shoot?
"A. No.
"Q. Was the gun in your mother's hand when you heard the three shots?
"A. Yeah.
"Q. Now, did you see what she shot at?
"A. Uh-huh.
"Q. What did she shoot at?
"A. He was running back towards the house.
"Q. He was running back towards the house when she fired the three shots, is that right?
"A. Yeah."

*Redirect Examination*

"Q. Now, keep your voice up, Glenn. When Mama fired those three shots, of course, Mr. Russ was still coming up on her, wasn't he?

"A. No.

"Q. Where was he?

"A. Running back towards the house.

"Q. What I am saying: I thought that you told me when I asked you that when your mother fired these three shots, that she was backing up, is that correct? Is that what you told me?

"A. Yeah.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. And your mother was backing up and Mr. Russ was right with her is that correct?

"A. No

"Q. I mean you said a little while ago that he was backing her up, didn't you say that?

"A. She was backing up and then she reached in her purse and he turned around and started to run.

"Q. But she was backing up at the time she reached into her purse, wasn't she?

"A. Yes."

Marilyn Blocker, a thirteen-year old daughter, who witnessed the distressing encounter, testified in part:

"When she [Mrs. Blocker] pulled the pistol and pointed it at him, what did he do?

"A. Turned around.

"Q. And what did he do after he turned around?

"A. Huh?

"Q. What did he do after he saw the pistol and turned around? What did he do then?

"A. Started running.

"Q. Started running. Started running to the house, is that right?

"A. Yes."

It appears clear that Russ was not armed at the time and was carrying the record player in one of his hands as he ran toward the house in which he collapsed and expired.

It is true there was considerable evidence from friends and members of the Blocker family that Dorothy was frightened and crying, and that Russ had threatened to get his gun and kill her. Nevertheless, we believe that her state of mind and whether she fired the shots in her defense under a reasonable apprehension of immediate serious harm were questions of fact for the jury. (*State v. Booker,* 200 Kan. 166, 170, 434 P. 2d 801.)

The language of Mr. Justice Schroeder in *State v. Jones,* 185 Kan. 235, 243, 341 P. 2d 1042, appears entirely appropriate to the situation now at hand:

"While we may not agree with the finding of the jury, upon reviewing

the evidence from the cold printed record as we must, nevertheless, to hold as a matter of law the defendant's act in killing Oliver was justifiable or excusable, upon all the facts and circumstances here presented, would invade the province of the jury. The jury heard the witnesses testify, observed the manner in which they testified and observed their conduct and demeanor, particularly that of the defendant. By reason thereof the jury was far better qualified to formulate a proper basis for weighing the evidence and resolving the issue of self defense."

Glenn's testimony, as it has been quoted above, is the focus of a separate complaint by the defendant. During final argument the county attorney referred to his testimony and said:

". . . Even though Mr. Scott attempted to change his testimony and attempted to persuade him otherwise, the boy stayed with the truth and told it."

Mr. Charles Scott, one of the defendant's attorneys, objected to this language as an unfavorable and improper remark exceeding the bounds of fair argument. Mr. Crews thereupon stated that his intent was not to be critical of defense counsel and the judge ended the colloquy by saying he was sure no impropriety was implied or intended, and he cautioned counsel for the future.

Although the state's argument might have been differently phrased, we think its essential import was simply to point out that Glenn's testimony remained unshaken on redirect examination despite attempts to rehabilitate him as a defense witness. Taken in this sense we discern no fatal prejudice to the defendant or discredit to Mr. Scott.

The defendant assails at great length the instructions on the right of self defense, labeling them objectionable, confusing, misleading, contradictory and uncertain. We do not so consider them. None of the adjectives used are appropriate to describe these instructions. Nor do we feel it necessary to burden this opinion by quoting the instructions, for they are somewhat lengthy. In our opinion, the instructions cover very adequately—and perhaps in much more detail than required—the essential elements of the age-old doctrine of self defense; the right of a person attacked to defend himself against serious personal harm and to use such force, but no greater, as reasonably appears to him to be necessary for that purpose, and in so acting the person attacked is justified.

In brief, the defendant directs our attention to the instruction on the use of force in defense of a person which is found in PIK 54.17, providing:

"A person is justified in the use of force to defend (himself) (another)

against an aggressor's imminent use of unlawful force to the extent it appears reasonable to him under the circumstances then existing."

The defendant suggests that this recommended instruction "strips away the confusion for a layman . . . and is much different than the instruction given by the court in this case." We incline to agree with the defendant's appraisal of the PIK instruction; that it does simplify the often prolix and diffuse instructions generally given in times past. However, in their overall context the instructions given by the court in this case do not differ in essence from the condensed and less complex form of the PIK instruction; they merely take longer to express the essence. We think the trial court did a commendable job with instructions on self defense. They reflect careful draftsmanship and "cover the waterfront." It is a basic principle that instructions must be taken as a whole (2 Hatcher's Kansas Digest [Rev. Ed.] Criminal Law, § 295) and not considered piecemeal. Viewing the instructions on self defense from this standpoint, we find in them no fault. We cannot adopt the procedure indicated by the appellant of isolating certain excerpts to be analyzed out of context.

An additional point raised with respect to instructions must be noted. It is contended the court erred in refusing to instruct the jury as to the turbulent character of the deceased and his predisposition to violence. An instruction along this line was orally requested, although it was not put in concrete form. The record contains a good deal of evidence of former acts and threats of violence on the part of Russ directed toward Dorothy; he appears a violent man possessed by jealousy. This evidence was properly admitted (3 Hatcher's Kansas Digest [Rev. Ed.] Homicide, §§ 47, 48) and the jury was entitled to consider it in conjunction with all the other evidence in the case. But we believe no error was committed in failing to include a specific instruction on the subject. In *State v. Danley*, 125 Kan. 111, 263 Pac. 1051, we held that where the jury has been instructed to consider all the evidence in determining guilt or innocence, as is true here, it was not error to refuse an instruction directing attention to a particular fact disclosed by the evidence. In general, we believe it improper to single out or give undue emphasis to particular facts or pieces of evidence. (*State v. Tawney*, 81 Kan. 162, 105 Pac. 218; *State v. Adams*, 89 Kan. 674, 132 Pac. 171.) We adhere to what was said in *State v. Murray*, 200 Kan. 526, 437 P. 2d 816:

". . . This court disapproves any instruction by which the trial court attempts to stress the comparative weight or potency of any particular type of competent evidence." (p. 529.)

On the hearing of the defendant's motion for new trial, four members of the jury were summoned for the ostensible purpose of finding out what went on in the jury room during deliberations. The state objected to this procedure as a fishing expedition for error and the court after much colloquy ultimately sustained the state's viewpoint. We believe the county attorney was correct in his diagnosis, and the court correct in its ruling. Mr. Scott, on being asked if he desired to make an offer of proof, responded that the jurors would generally describe matters they considered in arriving at their verdict, some of them *perhaps* being matters outside the scope of the evidence.

We have long adhered to the rule that a juror may not impeach his verdict on a ground inhering in the verdict itself; he may not divulge what considerations influenced him in arriving at his verdict or the reasoning on which he based his decision. (*State v. Buseman,* 124 Kan. 496, 260 Pac. 641; *State v. Boller,* 147 Kan. 651, 77 P. 2d 950.) Our case law to such effect has been codified in K. S. A. 60-441, which recites:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined."

In *Kincaid v. Wade,* 196 Kan. 174, 410 P. 2d 333, we said that the statute clarified but did not change existing law. It is manifest from the proffer of evidence that much of what defendant wanted to discover through questioning the jurors was inadmissible under our law.

On the other hand, evidence as to extraneous matters such as misconduct or physical facts or occurrences, either within or without the courtroom, is admissible if material to the issues being determined. (K. S. A. 60-444; *Kincaid v. Wade,* supra; *State v. Schroeder,* 201 Kan. 811, 822, 443 P. 2d 284.) This rule, however, is not intended to authorize broad hunting expeditions or fishing excursions. Some semblance of materiality must be made to appear. Here, the proffer made by the defendant was "iffy" at best, being prefaced by the adverb "perhaps." Indeed it was conceded that counsel had not even attempted to interview or visit with members of the jury.

Defense counsel had no idea whether cause existed for questioning the verdict.

Counsel sought to justify, or at least to explain, their failure to contact any jurors by referring to a conference with the trial court after the verdict was returned. At this conference they apparently sought to obtain the court's permission to interview members of the jury concerning their verdict.

Exactly what was said at the conference cannot be determined, but the record indicates there was discussion relating to the Code of Professional Responsibility and its predecessor, the Code of Legal Ethics. The defendant in her brief suggests that her lawyers were deterred from visiting with the jurors by what was said by the court. Counsel voiced this same contention at the oral argument for a new trial where the matter was fairly well aired. In response to the defendant's contention, the trial judge replied that while he had declined to say that defense attorneys had his permission to talk with the jurors he did not tell them they could not do so, but that he intended to leave that matter up to them. When Mrs. Blocker's attorneys were asked if they were complaining about the court's conduct, one of them, Mr. Marietta, replied in the negative, and we accept this at face value.

In our opinion the trial court was correct in declining to grant permission to talk to the jurors, for such was not its prerogative. DR 7-108 (D), Code of Professional Responsibility, treats the subject in this fashion:

"After discharge of the jury from further consideration of a case with which the lawyer was connected, the lawyer shall not ask questions of or make comments to a member of that jury that are calculated merely to harass or embarrass the juror or to influence his actions in future jury service." (p. 92.)

Implicit in this rule is the view that after a verdict has been returned it is not improper for an interested attorney to interview members of the jury so long as the limitations of the rule are observed. This concept is clearly expressed in Ethical Considerations 7-29, Final Draft, ABA Code of Professional Responsibility (July 1, 1969, p. 84), where it is said:

". . . After the trial, communciation by a lawyer with jurors is permitted so long as he refrains from asking questions or making comments that tend to harass or embarrass the juror or to influence actions of the juror in future cases. Were a lawyer to be prohibited from communicating after trial with a juror, he could not ascertain if the verdict might be subject to legal

challenge, in which event the invalidity of a verdict might go undetected. . . ."

See, also, ABA *Opinion* 319 (1968) cited on page 100 in support of EC 7-29.

As a final point, the defendant argues that the jury was coerced into bringing in a verdict by being kept together until 11:25 p. m., at which time the verdict was returned. There is nothing in the record to sustain this position.

The trial lasted three days. At 5:23 of the third day the jury retired to consider its verdict. It was excused for supper at 5:37, returned at 6:35 and deliberated continuously, as both parties have agreed, for a total of four hours and fifty minutes. Considering the complexity of the case and the time spent in trial, this is not an excessive length of time for a jury to deliberate, and does not itself suggest coercion. Neither does the lateness of the hour indicate improper pressure by the court. The jury made no request for earlier dismissal, nor did it report itself deadlocked or unable to agree. It is well known that in western Kansas, juries frequently, and of their own volition, remain in session until late hours.

We find no prejudicial error and the judgment of the trial court is affirmed.