No. 46,989

STATE OF KANSAS, *Appellee*, v. BETTY RAE STAFFORD, *Appellant*.

(515 P. 2d 769)

Opinion filed November 3, 1973.

*Robert R. Arnold,* of Wichita, argued the cause and was on the brief for the appellant.

*Keith Sanborn,* district attorney, argued the cause, and *Vern Miller,* attorney general, and *Stephen M. Joseph* were with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: Betty Rae Stafford was convicted by a jury of second degree murder arising from the death of her husband James O. Stafford (K. S. A. 1972 Supp. 21-3402) and of falsely reporting a crime (K. S. A. 1972 Supp. 21-3818). New trial was denied, sentence was pronounced and Mrs. Stafford now appeals.

A partial summary of testimony and events will be made first. Other facts, where necessary, will be stated in connection with the parties' contentions.

On the evening of February 5, 1971, Police Officer King was dispatched to the Stafford residence in Wichita. Upon entering the Stafford home he was met by Jody Stephenson, daughter of appellant Betty Stafford, who told him her daddy had been hurt. The officer proceeded to the kitchen where he observed James O. Stafford lying on the floor dead. He found appellant in a bedroom with her two sons. She told him she and her husband were sitting in the kitchen when a Mexican man walked into the kitchen, grabbed her husband, wrapped a necktie around his neck and started choking him saying he wanted money. She stated she jumped on the back of the man and tried to get him away from her husband but he elbowed her in the stomach and pushed her away; that she then went to the bedroom and got $120.00 and laid it on the kitchen stove; when she returned to the kitchen the Mexican had Mr. Stafford on the floor and was beating him about the head and shoulders with a hammer; she told the man to take the money; the man threatened her but finally gagged and bound her to the bed in the bedroom where her children found her upon their return from the bowling alley.

Appellant was taken to the Wichita police department where she repeated to two detectives her statement of the assault by the Mexican. Later she was interviewed by a police captain and another

detective. She repeated three more times the story of the killing of her husband. Because of discrepancies in the various accounts the officers gave her the *Miranda* warning of her rights. The detective asked if her oldest son had assaulted her husband and she was trying to cover up. This upset her and she said she had been lying and she would tell them the truth.

Mrs. Stafford then told the officers she had killed her husband. She stated that upon returning home in the afternoon her two boys got into an argument over a TV program and were noisy; her ulcers were bothering her so she gave the boys ten dollars to go to a bowling alley to eat and to bowl; the oldest girl took the boys to the bowling alley and then was to go to the hospital to visit a friend. (These were stepchildren to the decedent, Mr. Stafford.) Appellant said she took the phone off the hook, dialed and then put it under the mattress so she wouldn't be disturbed; her husband arrived home; while they were seated at the dinner table Mr. Stafford commented that her son-in-law resembled a Cadillac because a Cadillac could not pass a filling station and he could not pass a beer tavern; this statement made her "mad"; her husband made reference to a friend of hers and that possibly she would like to marry him; this made her "real" angry; he also referred to disciplining the oldest boy, saying the biggest problem was that he could not punish him as she would not let him be beaten and what she really needed was to be beaten herself; as she was standing in the kitchen preparing to make coffee he struck her behind the left ear, knocking her glasses off; the blow did not bruise or hurt her; she then squirted him in the face with a paralyzer spray from a pressurized can; this dazed him and as he was trying to rub the spray out of his eyes she wrapped the cord from the electric tea kettle around his neck and choked him with it; she grabbed him by what little hair he had on his bald head and threw him against the wall; she then threw him down on the floor and got astraddle of him with her knees on his arms; her husband was whimpering, saying "Why are you doing these things to me". Appellant stated to the officers "This really pissed me off". Continuing, she said she picked up a hammer which was near the refrigerator and hit him with it three or four times; she then went to the bedroom, tied herself up and waited for the kids to return; her children later came home, untied her and called the police.

Medical testimony indicated that strangulation was the cause of

Stafford's death. Insurance against death and accidental death was carried on his life in six different policies in the total sum of $77,500. Appellant was the beneficiary in these policies. All of them, except one group policy which decedent had through his job, were issued either in 1970 or 1971. One was issued February 1, 1971, and premium for another policy which had lapsed was put in the mail at appellant's direction on the afternoon of the slaying, February 5, 1971.

Appellant's first contentions of error arise from the failure of the trial court, and the magistrate court as well, to grant her request for production of witnesses' statements and reports pursuant to K. S. A. 1972 Supp. 22-3213.

Four police officers testified at appellant's preliminary examination in magistrate court as to their investigation of the killing. Their testimony included recital of the making of oral statements by appellant as already related. Each officer testified he had made a report or statement covering the same information. Generally, the procedure followed was that at the end of the day each officer dictated into a recording machine a factual statement of his investigations and the events he had experienced; these tapes were then transcribed by a secretary; sometimes the officer signed the written transcription, sometimes he did not; one copy of each report was retained in the police file in the case and another was furnished to the district attorney's office. Reports were so made in this case.

Upon the conclusion of the direct examination of each witness and after disclosure of the fact each had made a written report appellant moved that the prosecution be directed to furnish for her examination the report so made. The prosecution objected and the magistrate court summarily denied appellant's motions. In district court appellant sought unsuccessfully to have the charges against her dismissed because of the magistrate's refusal to order production of the statements.

At trial in district court the same four police officers, plus three additional ones who had also made reports of their investigations, testified as prosection witnesses. Again, following their direct examination, demand for production of their reports and statements was made and refused. In making its rulings the trial court made no examination of any of the statements and appellant's present counsel, who was also her trial attorney, has never been permitted to see them.

Appellant's request for production of the statements is based upon K. S. A. 1972 Supp. 22-3213, which provides:

"*Demands for production of statements and reports of witnesses.* (1) In any criminal prosecution brought by the state of Kansas, no statement or report in the possession of the prosecution which was made by a state witness or prospective state witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination at the preliminary hearing or in the trial of the case.

"(2) After a witness called by the state has testified on direct examination, the court shall, on motion of the defendant, order the prosecution to produce any statement (as hereinafter defined) of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

"(3) If the prosecution claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the prosecution to deliver such statement for the inspection of the court *in camera.* Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the prosecution and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

"(4) The term 'statement,' as used in subsections (2) and (3) of this section in relation to any witness called by the prosecution means—

"(*a*) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(*b*) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement."

Apparently the basis of the trial court's ruling was that a report by a police officer of his investigation is not a statement within the meaning of 22-3213.

Appellant makes essentially two arguments in support of her contention of error: First, that the statute makes no distinction

between the statement of an ordinary witness and that of a police officer who has made an investigation, and second, that our statute is modeled after the federal Jencks Act (18 U. S. C., § 3500) under which the federal courts have held that statements and reports made by government agents are discoverable.

Appellee points out that a police officer's investigative report was, prior to the enactment of 22-3213, subject to production only in the discretion of the trial court, citing cases such as *State v. Oswald,* 197 Kan. 251, 417 P. 2d 261. It argues such a report should not be construed as a statement producible within the meaning of 22-3213 by reason of certain provisos contained in K. S. A. 1972 Supp. 22-3212 which make a distinction between the discovery of documents made by investigating officers and discovery of other material. This latter statute, in pertinent part, provides:

*"Discovery and inspection.* (1) Upon motion of a defendant the court may order the prosecuting attorney to permit the defendant to inspect and copy or photograph any relevant (*a*) written or recorded statements or confessions made by the defendant, or copies thereof, which are or have been in the possession, custody or control of the prosecution, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney; (*b*) results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting attorney; (*c*) recorded testimony of the defendant before a grand jury or an inquisition; and (*d*) memoranda of any oral confession made by the defendant and a list of the witnesses to such confession, the existence of which is known, or by the exercise of due diligence may become known to the prosecuting attorney.

"(2) . . . Except as provided in subsection (1) (*b*) and (1) (*d*), this section does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by officers in connection with the investigation or prosecution of the case, or of statements made by state witnesses or prospective state witnesses (other than the defendant) except as may be provided by law."

The state's argument is that 22-3212 and 22-3213 relate to the same subject matter, and, being *in pari materia,* should be construed together, with the result statements of non-police witnesses are producible under the latter but not those of police witnesses.

We are unable to agree with the state's contentions. In the first place, the two cited statutes relate to different subjects, except as it may be said generally each is concerned with a form of disclosure by the prosecution, and they are designed to serve different ends. For present purposes 22-3212 relates to pretrial discovery of a par-

ticular type of statement while 22-3213 deals with statements of state witnesses who have testified either at a preliminary hearing or at trial. It has been said of the Jencks Act that its requirements are intended to provide a defendant with an opportunity for thorough cross-examination of prosecution witnesses, making the constitutionally guaranteed right of confrontation more meaningful. One of its purposes is to afford the defense an opportunity to impeach a witness who has testified (*United States v. Missler,* [4 CA, 1969] 414 F. 2d 1293).

Appellant correctly points out federal tribunals have uniformly held that statements and reports made by law enforcement and investigative government agents are producible in federal criminal cases under the Jencks Act (*Clancy v. United States,* 365 U. S. 312, 5 L. ed. 2d 574, 81 S. Ct. 645; 2 Wright's Federal Practice and Procedure, Criminal, § 417; Anno.: "Jencks Act—Statements Producible," 5 A. L. R. 3d, 763, 785).

K. S. A. 1972 Supp. 22-3213 is patterned after the Jencks Act (see Special Bulletin: Criminal Code, October, 1969, Kansas Judicial Council, p. 73). There are only two differences between our statute and the federal act: First, the Jencks Act permits the prosecuting attorney to elect not to comply with the court's order to produce a statement subject to the condition that the testimony of the witness be stricken or mistrial declared; and, second, our act requires production after a witness has testified at a preliminary hearing as well as at trial. Neither of these differences supplies reason for departure from the construction applied by the federal courts. It should also be noted that the federal jurisprudence contains a counterpart of our 22-3212—the fact is, the latter is patterned after Rule 16 of the Federal Rules of Criminal Procedure (see Special Bulletin, *supra,* p. 72).

It has been said that cases construing the Jencks Act as to statements or reports made by government agents can generally be divided into three groups: (1) Cases where the government agent who made the notes or reports in question testifies as a government witness and the notes or reports are sought by the defense for the purpose of impeaching him; (2) cases where a person interviewed by a government agent testifies as a government witness and the agent's notes or reports of the interview are sought by the defense for the purpose of impeaching the person interviewed; and (3) cases where a government agent's notes or reports are sought by

the defense for the purpose of impeaching another government agent who did not make the documents in question (5 A. L. R. 3d 785).

We have here a situation falling within the first group and we are aware of no reason why the federal interpretation should not be adopted. The language of 22-3213 is clear and unambiguous. The statute applies to "a witness called by the state". It does not differentiate between a police witness and a non-police witness. No exemption for a police officer who may have conducted an investigation is made as the legislature might easily have done had that been its intent. The statute does not, however, authorize access to those statements of a police officer which do not relate to the subject matter of his testimony. When the prosecution asserts that part of a statement or report is not relevant to the trial testimony of the witness then the trial judge is to inspect the statement or report *in camera* and excise such portions which do not relate to the subject matter of the witness' testimony.

Although the point has not been briefed appellee upon oral argument advanced the theory that under the separation of powers' doctrine the prosecution had executive privilege to decline production of the statements requested. No authority for this position has been cited and we are aware of none. Such precedent as exists is to the contrary. Generally it has been held that where the government chooses to rely on a witness for proof of the essentials of a criminal charge it cannot insulate him from thorough cross-examination by any claim of governmental privilege or sovereign right to secrecy (*Jencks v. United States*, 353 U. S. 657, 1 L. ed. 2d 1103, 77 S. Ct. 1007; *United States v. O'Connor*, 273 F. 2d 358 [CA2, 1959]; see also Anno.—"Government's Privilege Against Disclosure," 95 L. ed. 425; 97 L. ed. 735).

Consequently we hold that a police officer called by the state to testify on direct examination as to facts revealed by his investigation of an alleged crime is a witness within the meaning of K. S. A. 1972 Supp. 22-3213 (2) and the defendant is entitled to the production of any statement or report made by the officer in the possession of the prosecution relating to the subject matter of the witness' testimony.

Here it clearly appears that each of the various police officers made a statement, as that term is defined by subsection (4) (*a*) of 22-3213, which was relevant to his testimony and that such statement was in the possession of the prosecution at the time of the

preliminary hearing and the trial. The entire statute fits and must be applied. Accordingly, the magistrate conducting the preliminary examination and the trial court erred in denying appellant's requests for production. The remedy initially sought by her because of the first delinquency—dismissal of the charges—obviously is too drastic and will not be applied, but the question as to appropriate disposition remains. Appellee urges that in the event this court finds error in the trial court's refusal to order production then the harmless error rule should be applied, as has been done in the federal courts (see 2 Wright, *supra*, pp. 213-214). To this end appellee has supplied this court with copies of the statements in question together with seven volumes of transcript of the proceedings and it asserts examination of these will reveal no variance in the statements from the testimony given by the seven officers; hence, no prejudice to appellant resulted. We are reluctant, however, to declare the harmless error rule in this case particularly in view of other errors occurring which, cumulatively, require new trial and we decline to do so.

Treated chronologically, appellant's next specification of error is that the trial court erred in excluding her ten year old son from the courtroom during *voir dire* examination of the jury. She lamely asserts she was thereby denied her constitutionally guaranteed right to public trial.

Concededly the right is substantial but the term "public" is a relative one and its construction depends upon the various conditions and circumstances of each case (*United States v. Geise*, 158 F. Supp. 821, affirmed 262 F. 2d 151 [9CA, 1958]). The principal function of the guaranty was well stated many years ago by eminent constitutional authority:

"The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." (1 Cooley, Constitutional Limitations, 8th ed., 1927, p. 647.)

Courts have generally agreed the right is not without limitations and is not infringed by the exclusion from trial of youthful spectators when the evidence is likely to be of such nature as to have a demoralizing effect upon immature minds.

The child in question was under temporary custody of the Sedgwick county juvenile court at the time request for his presence

during *voir dire* was made. Appellant's counsel merely suggested his presence "would be of some benefit" to appellant. Certainly the testimony in the case was such as possibly to have a detrimental effect upon the child's mind. We think the exclusion was a proper exercise of judicial discretion which in no way abridged appellant's right to a public trial.

Appellant's next assertions of error are based upon twice-made mention during trial of her refusal to take a lie detector test. In the course of his opening statement to the jury the district attorney said:

"And then he asked her if she would take a polygraph examination. If she would consider that to show she didn't have any knowledge of it and she didn't kill her husband, and she said she didn't believe in that and she was too nervous and he said, well the operator can adjust the machine to take that into account, and she said she wanted to talk to her Bishop first."

Out of the presence of the jury appellant moved for a mistrial because of the foregoing remarks, which motion was denied. Later the court stated to the jury:

"The Court again will admonish the jury that opening statements are not evidence and you will not consider that as any evidence whatsoever in your deliberations. We are now starting the evidence with the witnesses."

The second mention of refusal to take a lie detector test is reflected in the record on appeal as follows:

"On August 3, 1971, the following proceedings were had in the Court's Chambers and out of the presence of the jury. Both counsel were present along with Captain Dale Hearon.

"Mr. SANBORN: There is a ruling, Captain Hearon, that at this point no mention may be made of the lie detector test. For the Court's benefit and Mr. Arnold's and the record, he asked her if she would take it and she advised that she would and he sent for Burroughs to administer it and while he was waiting for Burroughs is when she gave them this statement, is that correct?'

" 'CAPTAIN HEARON: Yes.'

"DALE HEARON was called as a witness for the State of Kansas and testified. He is a Police Captain with the Wichita Police Department. On February 5, 1971, he arrived at the crime scene at 9:20 P.M. He directed that the defendant be taken to the Station Interrogation Room. He interviewed the defendant along with Detective Oakley. The defendant had related to them three times the story of a Mexican male coming into the house and demanding money from her husband.

"the Mexican male appeared—

"Q. Go on, please.

"A. —and she, as I said, related this story to us about the Mexican male three times and I asked her then if her sons was involved in this and she said,

no, her sons were not involved. I then had further conversation with her and then I asked her if she would take the lie detector test.

"Mr. Sanborn: Well, you can't—I ask that that be stricken.

"The Court: Sustained. The jury will disregard that."

The trial court expressed considerable disquietude over the incident in a side-bar proceeding ostensibly outside the hearing of the jury but it again denied appellant's motion for mistrial. No further instruction was given the jury.

In Kansas the results of a lie detector test, because of their unreliability, have always been held to be inadmissible in evidence (see *Holt v. State*, 202 Kan. 759, 762, 451 P. 2d 221). Furthermore, in *State v. Emory*, 190 Kan. 406, 375 P. 2d 585, this court held that it is improper to admit evidence of an accused's unwillingness to take a lie detector test. The ruling is in accord with the majority rule elsewhere on the subject. Comment by counsel for the prosecution making such disclosure has also been held improper (see Anno. 95 A. L. R. 2d 819).

A more difficult question is presented as to the prejudicial effect of such impropriety in a given case. In some cases it has been held the error was cured by action on the part of the trial judge, that is, admonition to the jury to disregard improper comments by the prosecutor or improper testimony given from the witness stand. Appellee urges application of these rules and also points out the strength of its case, *i. e.*, appellant's confession, as negativing any possible prejudice. Appellant complains neither of the trial court's admonitions was clearly specific that mention of the lie detector test was not to be considered by the jury in reaching its verdict.

It is true the court's admonitions were somewhat vague and they did not contain any explanation for the ruling which might have tended to dispel the drawing of any unfavorable inferences from the stricken matter. It is likewise true a double-dose of impropriety occurred before the jury with respect to a lie detector test, the second coming so close on the heels of specific directions to the contrary as almost to evince calculated evasion of the ruling. The influence of the two incidents on the jury must be somewhat speculative. The question always remains, when forbidden matter is trumpeted to a jury, how is the blown horn effectively unblown? Undoubtedly, in many cases the hearing of improper comments or evidence has little or no impact which cannot be cured by prompt and decisive action on the part of the court, as we have often held,

but we are not entirely convinced that is the case here, especially when taken in connection with the other irregularities occurring at trial.

Appellant's next complaints arise from the court's rulings permitting the state to reopen its case and offer further testimony after both sides had rested and appellant had offered no evidence, and in denying appellant's motion for continuance.

On the afternoon of Tuesday, August 10, 1971, after more than two weeks of trial, the state rested its case. On the same day, without introducing any evidence, appellant rested her case, and court was adjourned until the next morning so that the court might prepare its instructions. On the following day, Wednesday, August 11, the state moved for permission to endorse on the information as a witness for the state the name of Barbara Carpenter and to reopen its case to present her testimony. Appellant's objections to this procedure were overruled as was her request for one week's continuance. The court did grant appellant's counsel opportunity to interview the witness and it also stated appellant could reopen her own case.

The witness Carpenter testified she had been an inmate of the Sedgwick county jail at a time when appellant was confined in an adjoining cell and that appellant stated to her that she had killed her husband. At the conclusion of this testimony each side again rested.

In justification to the court as to why earlier endorsement and use had not been made of the witness, the district attorney stated he had not discovered the witness' name until late Sunday night, August 8, had not learned of her address until Monday, August 9, had been unable to interview her until late Monday night, and further that the press of events on Tuesday, August 10, prevented him from carefully considering whether to call her as a witness. He acknowledged he was aware of her possible use as a witness prior to resting his case on Tuesday. It appears that during the course of the trial and prior to resting his case the district attorney had already secured permission to endorse the names of five other new witnesses, against which action no complaint is now lodged.

The prosecuting attorney is required to endorse on the information the names of all witnesses known to him at the time of filing and thereafter he may endorse the names of other witnesses thereon as

may afterward become known to him at such times as the court may by rule or otherwise prescribe (K. S. A. 1972 Supp. 22-3201 [6]).

The requirement of endorsement of witnesses is a safeguard extended to a defendant to prevent surprise and give him an opportunity to examine the witnesses for the state in advance of trial. Subsequent endorsement and use of witnesses must be left to the discretion of the trial court as the interest of justice may require. The exercise of this judicial discretion is not without limitation. When it is shown the use of such witnesses will result in surprise and material prejudice preventing a fair preparation for defense, the granting of permission to endorse and use additional witnesses constitutes an abuse of judicial discretion (*State v. Robertson*, 203 Kan. 647, 455 P. 2d 570).

In *State v. Blocker*, 211 Kan. 185, 505 P. 2d 1099, this summation appears:

". . . [P]ermission to endorse additional names on the information during trial rests within the sound discretion of the trial court, and its ruling will not be disturbed in the absence of abuse—the test being whether the defendant's rights have been prejudiced." (p. 188.)

This court has always denounced intentional surprise by the prosecutor in withholding names of witnesses to be used (*State v. McDonald*, 57 Kan. 537, 436 Pac. 966; *State v. Eidson*, 143 Kan. 300, 54 P. 2d 977).

Appellant contends the state's withholding of the witness Carpenter until she could be used as a surprise rebuttal witness without prior disclosure of her name constituted a ploy which backfired when appellant chose not to take the stand and testify; that the state had knowledge of the witness prior to resting its case and its reasons for not calling her earlier were insufficient to justify the failure. Appellee stoutly denies the charge of bad faith and asserts time was needed to evaluate whether such a person who had become enmeshed in the web of the law possessed sufficient probity to be placed on the witness stand.

Certainly the testimony in question was of a climactic and highly damaging nature. After it became known to appellant she sought but was denied continuance. Whether or not earlier notice of the witness' appearance or more time to investigate the witness would have enabled appellant to make any showing on the subject of the witness' probity must again remain a matter of some conjecture. Under all the circumstances we think the action of the prosecution

was irregular and the trial court might well have either denied the request to use the witness or granted a reasonable continuance.

We have now noted three errors or irregularities: Failure to require production of the police officers' statements after their direct examination; mention of refusal to take lie detector test; and belated use of a witness coupled with denial of continuance. The question arises whether prejudice to appellant's substantial rights has resulted. It is not always easy to say when error is so harmful as to require reversal. But we are convinced that where the cumulative effect of several such errors or irregularities is such we cannot declare from examination of the record as a whole that the substantial rights of an accused have not been prejudiced, new trial should be had. Everything considered, we are unable to say with reasonable certainty no prejudice resulted from the irregularities revealed in this trial or that the result would have been the same had they not occurred. Hence, new trial is in order.

Appellant's next specification of error is the trial court erred in failing to submit to the jury instructions on voluntary and involuntary manslaughter. The court denied appellant's requested instructions on the two offenses. Her brief contains no factual contention or legal argument in support of error based on the court's failure to instruct on involuntary manslaughter. We are aware of none and that aspect of the assigned error will be deemed abandoned.

As to the issue upon voluntary manslaughter, appellant relies upon the statutory duty of a trial court to instruct a jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information and the evidence adduced (K. S. A. 1972 Supp. 21-3107 [3]), which duty was previously placed upon the court by case law. Appellant simply asserts without elaboration that the evidence revealed the killing of James O. Stafford was done upon a sudden quarrel or in the heat of passion, bringing into play the lesser included offense of voluntary manslaughter as defined by K. S. A. 1972 Supp. 21-3403.

We cannot agree. Although new trial is to be ordered and we cannot know what different evidence, if any, will be adduced, we deem the evidence in the record before us insufficient to warrant submission of an instruction on voluntary manslaughter. We have already recited the pertinent testimony, which consisted of appellant's oral statements to the investigating officers, medical opinion as to the cause of death and evidence concerning insurance on

decedent's life. We will not belabor that evidence or attempt a treatise on the law of voluntary manslaughter. As applicable here, an intentional homicide committed upon a sudden quarrel or in the heat of passion engendered by adequate provocation, and not the result of malice conceived before the provocation, is voluntary manslaughter (see *State v. McDermott,* 202 Kan. 399, 449 P. 2d 545). Suffice it to say further, although there was some evidence of prior quarreling and even of a blow being struck by the decedent, we believe insufficient provocation existed to reduce to voluntary manslaughter the eventual strangulation of one flat on his back in a disabled condition.

Finally appellant urges error in the fact the district attorney in his closing argument to the jury referred to her attorney as court-appointed. Although the disclosure was irrelevant and should not have been made, it was voiced only in passing fashion and the assertion of error is frivolous.

The judgment is reversed with directions to grant appellant a new trial.

APPROVED BY THE COURT.